**Andrew Payne LONGAKER,**
**Appellant/Appellee,**

v.

**Andrew Reed EVANS, Individually and as Temporary Administrator of the Estate of Marion Longaker Evans, Appellee/Appellant.**

No. 04–97–01046–CV.

Court of Appeals of Texas,
San Antonio.

Nov. 22, 2000.

Earle Cobb, Jr., Thomas H. Crofts, Jr., Crofts, Callaway & Jefferson, P.C., San Antonio, for Appellant.

Lewin Plunkett, Cathy J. Sheehan, Plunkett & Gibson, Inc., San Antonio, for Appellee.

Sitting: PHIL HARDBERGER, Chief Justice, TOM RICKHOFF, Justice, ALMA L. LOPEZ, Justice, CATHERINE STONE, Justice, PAUL W. GREEN, Justice, SARAH B. DUNCAN, Justice, KAREN ANGELINI, Justice.

## ON MOTION FOR EN BANC RECONSIDERATION

Opinion by PAUL W. GREEN, Justice.

The motion for rehearing of the July 7, 1999 panel opinion is overruled. However, the motion for en banc reconsideration is granted. Accordingly, the panel opinion dated July 7, 1999 is withdrawn and the en banc court substitutes the following opinion. The judgment remains unchanged.

\* \* \*

This case involves a will contest and a judgment for damages against a fiduciary. Andrew Payne Longaker (Longaker) appeals from the trial court's judgment disposing of certain assets of the estate of his sister, Marion Longaker Evans (Marion). Marion's son, Andrew Reed Evans (Evans), cross-appeals to contest the trial court's failure to find that Longaker exerted undue influence over Marion in the creation of her 1995 will. Evans alternatively asserts Marion's estate is entitled to damages for Longaker's breach of fiduciary duty and legal malpractice in the event Longaker is successful on appeal. We reverse those portions of the judgment pertaining to Longaker's complaints and render judgment in his favor; we affirm those portions of the judgment pertaining to Evans's complaints.

### BACKGROUND

Marion and her husband, John, moved to San Antonio in 1979, after John was diagnosed with a terminal illness. To provide for Marion's support, John created Trust A, a marital deduction trust funded by securities.[1] John established the trust with the legal counsel of Ben Chilcutt and arranged for the trust to be administered by Frost Bank through its trust officer, William Clyborne.

After John died in 1980, Marion routinely sought financial advice from Bill McEntire, an accountant, and legal advice from Chilcutt. In 1988, Chilcutt drafted a new will for Marion. Under the 1988 will, Marion's siblings would each inherit $50,000, while $100,000 would be placed in trust for Marion's grandson. Furthermore, Marion's son, Evans, would inherit Marion's tangible personal property and the residuary estate, which included the assets of Trust A.

Marion had a close relationship with Evans and his family and spent summers with them in New Hampshire. During the summer of 1994, however, Marion's health declined and she spent much of her visit resting in bed. In May 1995, Marion was diagnosed with uterine cancer, for which she underwent surgery on May 30. Marion subsequently received radiation treatment from June 20 through July 3. The radiation made Marion "deathly ill," causing abdominal complications and dehydration. Furthermore, Marion's medications caused her to be sedated, confused, and lethargic. The severity of these side effects was disputed in the court below.

On July 6, 1995, Marion executed a new will drafted by her brother, Longaker. Longaker is a licensed attorney, although he has not practiced since the 1940s. At trial, Longaker testified he simply adopted the majority of the 1988 will's provisions while changing selected dispositions at Marion's direction. Longaker further insisted he acted not as Marion's attorney but simply as her brother and "advisor." The evidence showed, however, that Longaker drafted correspondence to Frost Bank on his attorney letterhead and

---

1. John also created a second trust that is not involved in this lawsuit.

signed correspondence as Marion's attorney.

Marion signed the will, which was witnessed and notarized, in the waiting room of Dr. Walthall, her family physician. One of the witnesses was Marion's friend and practical nurse, Ila Rodriguez, who had accompanied Marion to the doctor's appointment. At trial, Rodriguez testified that Marion expressed, while waiting to see the doctor on July 6, a wish to die because she was experiencing overwhelming pain and discomfort. Furthermore, Rodriguez stated she was unsure Marion read the will before signing it or even knew it was her will she was signing. It was undisputed the will was not read aloud at its execution. According to Rodriguez, Marion often submitted to Longaker's demands and sometimes feigned sleep to avoid him. Dr. Walthall said Marion appeared capable of making decisions on the day of their visit. Finally, Longaker testified he neither sought estate planning or tax advice when drafting the will nor informed Marion she should seek such advice on her own.

Although Marion's gifts to her sister and grandson remained the same under her new will, her bequest to Longaker was notably more generous than the $50,000 bequest provided by the 1988 will. Under the new will, Longaker was entitled to receive the following items he would not have received under the 1988 will:

1. $100,000 in cash;
2. any Certificates of Deposit in banks;
3. any United States issued securities: bonds, bills, and notes;
4. any corporate stocks and bonds not in present trusts;
5. any cash in banks not involved in existing trusts;
6. all automobiles which [Marion] may own; and
7. all transferable memberships in clubs.

Under the 1995 will, Evans would receive Marion's tangible personal property, the Frost Bank management agency account that held the proceeds from the sale of Marion's New Hampshire home, and the residuary estate, which included the assets in Trust A.

The day after Marion signed her new will, she was admitted to the hospital for treatment for dehydration. She went home on July 28, only to be admitted again on July 30 for a broken hip and pneumonia. Because she required rehabilitation and an additional hospital stay, Marion could not go home until September 15. Once home, Marion required living assistance.

In October, Longaker, purporting to act on Marion's behalf, began the process of dismantling Trust A and to channel its assets to accounts over which he had joint control. First, he notified bank trust officer Clyborne that Marion wished to terminate Trust A as soon as possible. Clyborne informed Longaker of his intent to contact Chilcutt, the trust's attorney of record, to determine whether Marion had authority to remove all the assets from the trust. Clyborne also informed Longaker the bank required Marion's personal authorization. Concerned about the tax consequences associated with dismantling the trust and not knowing the contents of Marion's 1995 will, Clyborne also suggested Marion confer with financial consultant McEntire and attorney Chilcutt.

In response, Longaker notified Clyborne, by letter dated November 15, that Marion would not be available for conference. Because Clyborne was unable to meet personally with Marion, he hired attorney Nancy Nowlin Kerr, a probate and estate planning specialist, to visit Marion at home. Kerr testified the purpose of her visit was to formulate a lay opinion about whether Marion had sufficient mental capacity to terminate Trust A. During her fifteen to twenty-minute visit with Marion on November 25, Kerr inquired whether Marion understood that the trust assets, once removed, would no longer be

subject to Frost Bank's management. Kerr further asked whether Marion had confidence in Longaker in light of his potential control over the assets. Marion indicated she was aware that terminating the trust and channeling the assets in the intended fashion would enable her brother to exert control over her property. Although Marion never expressed any unhappiness with the bank's administration of the trust, she preferred the assets to be under her control, or that of her brother, rather than the bank's control. Apparently, Longaker had discussed with Marion the possibility of increasing the value of the trust corpus by investing in the stock market. Longaker was present at this meeting between Marion and Kerr, but Kerr reported that Longaker remained quiet during the discussion. He did, however, refuse Kerr's suggestion that Marion meet with Clyborne. In the end, Kerr obtained a written authorization from Marion to terminate Trust A.

Clyborne also received a letter from Marion, dated December 19, directing the trust's termination. Marion signed the typewritten letter, which Longaker testified he composed at Marion's direction. Clyborne never had the opportunity to discuss this letter with Marion, nor did Clyborne ever see a copy of Marion's 1995 will.

Upon the termination of the trust, Longaker transferred Trust A's assets—$309,771.17 in cash and securities valued at $142,912.75—into two of Marion's Frost Bank accounts. The cash went into a money market checking account, which listed Longaker as a signatory. The securities were placed into a brokerage account, which named Longaker as a joint tenant with the right of survivorship. Longaker subsequently made additional deposits to the checking account from Marion's Bank One account, Marion's First New Hampshire Bank account, the proceeds from a City of Concord bond, and additional cash from an unspecified source. The balance in the Frost Bank money market account eventually totaled over $550,000. Finally, Longaker charged Marion $10,000 for his services associated with dismantling Trust A and transferring its assets.

On October 17, 1996, six days before Marion's death, Longaker withdrew $557,603.75 from the checking account which he then placed in a Frost Bank safekeeping account in his name. These funds were later used to purchase $570,000 in U.S. Treasury bills. A balance of $4500.75 was left in Marion's checking account.

During the two days preceding Marion's death, Evans and McEntire asked Longaker to produce the 1995 will and to identify the location of Trust A's former assets. McEntire reviewed the will and opined it was drafted by Longaker to increase its bequest to him. When Marion died on October 23, Evans obtained a restraining order preventing Longaker from removing funds from the safekeeping and brokerage accounts which held Trust A's former assets.

Evans contested the 1995 will and sought to have the 1988 will admitted to probate. He alleged that Longaker procured the 1995 will by undue influence and, further, damaged Marion's estate by terminating Trust A and by transferring estate funds into his own bank account. Longaker said Trust A was terminated according to Marion's wishes and he denied any exclusive right of ownership to Marion's funds.

### The Findings of Fact

The trial court found no undue influence by Longaker in the creation of the 1995 will and admitted it to probate. However, it found that Longaker breached his fiduciary duty to Marion, causing her to terminate Trust A without advising her that, by doing so, the trust assets might go to Longaker instead of Evans. The trial court also found that Longaker converted the cash and securities that had been the

assets of Trust A, and breached his fiduciary duty to Marion by transferring the assets into accounts he controlled. Pursuant to these findings, the trial court recharacterized the cash and securities into choses in action belonging to the estate that passed to Evans under the residuary clause of the will. Alternatively, the court found that Longaker committed legal malpractice that caused $550,000 in damages to Marion's estate. Finally, the court found that Longaker returned the Trust A assets to the estate.

## The Judgment

The final judgment directs that Longaker is to receive forty-five shares of DuPont stock, cash in the Bank One account, cash in the Citizens Bank (formerly First New Hampshire) account, automobiles, and $100,000. Evans is awarded the Fidelity Municipal Bond Fund account; the Colonial Group Mutual Funds account; the City of El Campo, Texas bonds; furniture, fixtures, and household goods; the Frost Bank management agency account holding the proceeds from the New Hampshire home sale; the treasury bills Longaker bought with the $557,603.75 transferred from Marion's account to his own; and the securities held in the brokerage account. Finally, the judgment dismisses the estate's damages claim as moot since the Trust A assets had been returned to the estate.

\* \* \*

The parties have raised the following issues: First, whether the finding that Marion's 1995 will was not procured by undue influence is not supported by factually sufficient evidence—in other words, whether the finding is against the great weight and preponderance of the evidence. Next, whether the findings that Longaker converted the Trust A assets and breached his fiduciary duty to Marion are supported by legally and factually sufficient evidence. Next, whether the bequest to Longaker of "corporate stocks and bonds" excludes mutual funds and municipal bonds. And finally, whether the trial court's alternative finding that Longaker's legal malpractice damaged the estate has any validity and, if it does, whether it is supported by legally and factually sufficient evidence.

We follow the established standards of appellate review for legal and factual insufficiency. *See Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex.1998); *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986).

## Undue Influence—The 1995 Will

Evans argues the trial court's finding that Longaker exerted no undue influence over Marion in the creation of her 1995 will is contrary to the great weight and preponderance of the evidence. We disagree.

Evans bore the burden of establishing undue influence. *See Rothermel v. Duncan*, 369 S.W.2d 917, 922 (Tex.1963). When the trial court makes a negative finding on an issue upon which the appellant bears the burden of proof, reversal is warranted only when a review of all the evidence indicates that the great weight of the evidence supports an affirmative answer. *Herbert v. Herbert*, 754 S.W.2d 141, 144 (Tex.1988). Although evidence of undue influence is often circumstantial, it must demonstrate: (1) the existence and exertion of undue influence, (2) the effective operation of such influence so as to subvert or overpower the mind of the testator at the time of the execution of the testament, and (3) the execution of a testament which the maker would not have executed but for such influence. *Rothermel*, 369 S.W.2d at 922; *Evans v. May*, 923 S.W.2d 712, 714–15 (Tex.App.—Houston [1st Dist.] 1996, writ denied); *Smallwood v. Jones*, 794 S.W.2d 114, 117 (Tex. App.—San Antonio 1990, no writ). We note that "influence is not undue unless the free agency of the testator was destroyed and a testament produced that expresses the will of the one exerting the

influence.... [O]ne may request or even importune and entreat another to execute a favorable dispositive instrument; but unless the importunities and entreaties are shown to be so excessive as to subvert the will of the maker, they will not taint the validity of the instrument with undue influence." *Rothermel,* 369 S.W.2d at 922.

█ The record indicates Longaker had ample opportunity to influence Marion. Longaker served as Marion's last legal and financial adviser. He also cared for her while she was seriously ill. In addition, Longaker redrafted Marion's will and supervised its execution on a day in which Marion was experiencing great pain and discomfort.

All of this evidence, however, merely provided Longaker with the opportunity to exert influence; it does not tend to establish that Marion's free agency was destroyed, that her will was subverted, or that Marion's last testament expresses Longaker's will rather than her own. *See id.* at 920–21 (finding no undue influence where feeble testatrix lived on isolated farm with son; son handled all business affairs of testatrix; son drafted will, without consulting counsel, leaving entire estate to self); *see also Smallwood,* 794 S.W.2d at 118 (holding testatrix's suffering from Parkinson's disease was not evidence of undue influence). Indeed, the evidence also shows that Marion's will was properly executed and consists of the terms she dictated to Longaker. Furthermore, Dr. Walthall said he doubted that Marion was susceptible to influence on the day she signed her will. According to Dr. Walthall, Marion was capable of independent decision-making and was fully aware of what happened that day.

█ In light of all the evidence, we cannot say the trial court's finding that the 1995 will was not procured by undue influence is against the great weight and preponderance of the evidence. A will executed in compliance with legal formalities "by one mentally capable of executing it should

not be set aside upon a bare suspicion of wrongdoing." *Smallwood,* 794 S.W.2d at 118. Evans's contentions constitute no more than bare suspicion. Accordingly, Evans's factual insufficiency issue is overruled.

### CONVERSION/BREACH OF FIDUCIARY DUTY

The center of the dispute between Longaker and Evans is the termination of Trust A. That is because Evans was entitled under either the 1988 or the 1995 will to receive the assets of Trust A but, because the trust was dismantled by Longaker before Marion's death, the former trust assets are instead designated to go to Longaker under provisions added in the 1995 will. Evans, quite understandably, wants to avoid the effect of the trust termination and take under Marion's will what he believes she intended for him to have—that is, he should receive the former trust assets under the will just as if the trust had never been dismantled. This result was accomplished when the trial court found in Evans' favor and awarded him the former trust assets under the residuary clause of the will as choses in action for conversion and breach of fiduciary duty on the basis that Longaker had wrongfully assumed control over the assets.

### *Conversion*

█ Longaker contends the trial court's findings do not support a conversion cause of action as a matter of law. We agree. Conversion is established by proving 1) the plaintiff owned, had legal possession of, or was entitled to possession of the property; 2) the defendant assumed and exercised dominion and control over the property in an unlawful and unauthorized manner, to the exclusion of and inconsistent with the plaintiff's rights; and 3) the defendant refused the plaintiff's demand for the return of the property. *Ojeda v. Wal–Mart Stores, Inc.,* 956 S.W.2d 704, 707 (Tex. App.—San Antonio 1997, writ denied).

█ Even if it is assumed, without deciding, that the transfer of Marion's money

market funds to an account controlled exclusively by Longaker constitutes some evidence Longaker exercised unauthorized control over Marion's funds in a manner that was inconsistent with her rights, there is no evidence the property was not returned on demand. Indeed, it is conclusively shown, and specifically found by the court, that the assets traceable to the money market funds and any earnings on those funds were preserved and returned to the estate for distribution in accordance with the terms of the 1995 will. It is unrealistic and artificial to recognize the existence of these assets in the estate yet, at the same time, consider them to have been converted by Longaker. In short, there is no evidence the estate was damaged when Longaker withdrew funds from Marion's money market account. *See United Mobile Networks, L.P. v. Deaton,* 939 S.W.2d 146, 147 (Tex.1997) (requiring proof of damages for conversion).

Moreover, the record does not support a finding that Longaker converted the Trust A securities. On Marion's authority, the securities were placed in a joint tenancy brokerage account after the trust was dismantled—and they stayed there. Marion was not dispossessed of the securities at any time. Longaker was not able to and did not exercise exclusive control over the securities, and there is no evidence he did anything with them that was inconsistent with Marion's rights.

Because there was no evidence to support a finding that Longaker converted the Trust A cash or securities, we conclude the trial court erred in awarding these assets to Evans under the residuary clause of the will as a chose in action for conversion.

### Breach of Fiduciary Duty

The trial court also found Longaker breached his fiduciary duty to Marion

by causing Trust A to be terminated and by then transferring its assets from Marion's accounts to accounts accessible by him. The breach of fiduciary duty claim arises out of the attorney-client relationship between Longaker and Marion. *See Archer v. Griffith,* 390 S.W.2d 735, 739 (Tex.1964) ("The relation between an attorney and his client is highly fiduciary in nature, and their dealings with each other are subject to the same scrutiny, intendments and imputations as a transaction between an ordinary trustee and his cestui que trust.").

Like the conversion claim, the breach of fiduciary duty claim fails because there is no evidence Marion was damaged by Longaker's actions. As noted earlier, the former trust assets were never lost to the estate. Consequently, even if Longaker acted improperly when he transferred Marion's money market funds and securities, without her knowledge, to accounts he could access, in the absence of a loss, the estate has no basis for a chose in action for breach of fiduciary duty that could be awarded under the residuary clause of the will.[2]

Further, the finding that Longaker breached his fiduciary duty by wrongfully causing Trust A to be terminated cannot be the basis for an award of the trust assets to Evans under the residuary clause of the will. The trial court found Longaker breached his fiduciary duty to Marion by "suggest[ing] that Trust A be terminated," and by "caus[ing] [Marion] to execute documents to terminate Trust A without advising [her] that by doing so, the assets therein might go to [Longaker] instead of her son." The court concluded from this that Longaker "used his fiduciary relation-

2. Anticipating the damages problem, the estate alternatively argues that proof of damages is not required when a lawyer breaches a fiduciary duty to his client, citing *Burrow v. Arce,* 997 S.W.2d 229 (Tex.1999). *Burrow v. Arce* is a fee forfeiture case. In that case, the supreme court held that a client "need not

prove actual damages in order to obtain forfeiture of an attorney's fee for the attorney's breach of fiduciary duty to the client." *Id.* at 240. The holding has no application in this case where the client/estate does not seek fee forfeiture, but rather seeks actual damages caused by the fiduciary's misconduct.

ship to attempt to arrange his sister's estate to benefit himself." Assuming all this to be true, the fact remains that the trust assets were not lost to the estate when the trust was terminated. With the former trust assets intact, the estate had no claim against Longaker for breach of fiduciary duty that could pass to Evans under the residuary clause of the will as a chose in action.

■ It is true, however, that the termination of the trust damaged Evans' expectation that he would receive the former trust assets on Marion's death. But Evans has no remedy against Longaker for his lost expectation. First, Longaker owed Evans no duty. *See Barcelo v. Elliott*, 923 S.W.2d 575, 579 (Tex.1996) (attorney for testator owes no professional duty of care to persons named as will beneficiaries). Second, while there is much speculation that the trust termination was not a result of Marion's free act, there is no competent evidence that Longaker wrongfully influenced or otherwise induced Marion to do anything she did not otherwise intend to do.

The findings of fact and judgment rest on the assumption that Marion had a fixed plan for the trust assets to go to Evans. However, there is no support in the record for this assumption. There is no evidence, for example, that Marion would never have agreed to terminate the trust if she had known it would effectively redirect the trust assets from Evans to Longaker in her will. And any conclusion that Marion's testamentary intent was thwarted by Longaker's misconduct is based only on speculation. Even if Longaker's counsel to Marion was tainted by his self-interest, we cannot presume she was influenced to act against her true wishes.

■ Marion was free to terminate the trust and dispose of its assets anytime she wanted to, notwithstanding any specific bequests in her will. *See Shriner's Hosp. for Crippled Children of Tex. v. Stahl*, 610 S.W.2d 147, 150 (Tex.1980) ("Absent a con-

trary intention expressed in the will, the alienation or disappearance of the subject matter of a specific bequest from the testator's estate adeems the devise or bequest."). There is no evidence Marion was not freely acting upon her own wishes when she sought to terminate the trust, just as she told attorney Kerr. Accordingly, the estate is unable to show that Longaker's conduct with respect to the trust termination and his handling of the former trust assets caused any harm to Marion.

### LEGAL MALPRACTICE

The trial court also found that Longaker's legal malpractice and breach of fiduciary duty caused damages to Marion's estate in the amount of $550,000 in estate taxes. However, the claim for damages was dismissed as moot when the trust assets were returned to the estate and because Evans, acting on behalf of the estate, agreed to waive damages if the trial court construed the 1995 will in the manner indicated by the judgment.

The trial court, allowing that this court might not agree with its disposition of the case, made the following additional finding:

In the event an appellate court changes the interpretation of the 1995 Will in a manner that is *materially different* from the Judgment in this case, ANDREW REED EVANS, as Independent Executor of the estate of MARION LONGAKER EVANS, is entitled to recover from ANDREW PAYNE LONGAKER the sum of $550,000 as damages for his breach of fiduciary duty and for his legal malpractice which proximately caused damages to the estate in that amount. (emphasis added).

Our holding that the conversion and breach of fiduciary duty findings were not supported by legally sufficient evidence does not affect the trial court's interpretation of the 1995 will. We determined only that the estate had no viable cause of action against Longaker for his handling of the former trust assets. We do, however, disagree with the trial court's interpreta-

tion of the provision in Marion's 1995 will that disposes of her corporate stocks and bonds. *See infra.* To the extent our interpretation of this provision is materially different, we must consider whether we should render a judgment awarding the estate $550,000 damages for Longaker's legal malpractice and breach of fiduciary duty. *See* Tex.R.App. Proc. 43.3.

### Negligence

■■■■■ Legal malpractice actions are governed by negligence principles. *Barcelo,* 923 S.W.2d at 579; *Estate of Arlitt v. Paterson,* 995 S.W.2d 713, 719 (Tex.App.— San Antonio 1999, pet. denied). Thus, to establish a claim of legal malpractice, Marion's estate was required to prove that Longaker owed her a duty, that he breached that duty, and that the breach proximately caused her injury and damages. *See Cosgrove v. Grimes,* 774 S.W.2d 662, 665 (Tex.1989). An attorney is held to the standard of care that would be exercised by a reasonably prudent attorney, and expert testimony is required to establish that standard of skill. *Hall v. Rutherford,* 911 S.W.2d 422, 424 (Tex.App.—San Antonio 1995, writ denied).

■■■ The trial court found that, while acting as Marion's attorney, Longaker was "negligent in not advising [Marion] of the effect of closing Trust A, of the way the accounts were set up, of the effect on her desired disposition of her assets and in not advising her of the effect on estate taxes of her Estate Plan and in keeping her away from competent and reliable estate planners who could have saved her estate substantial money in estate taxes." Although the evidence supports the existence of an attorney-client relationship between Longaker and Marion, the professional negligence claim fails because there is no competent evidence that Longaker's conduct violated the lawyer's standard of care. No expert testimony was offered that Longaker failed to exercise the care of a reasonably prudent lawyer when advising Marion in connection with her estate.

### Breach of Fiduciary Duty

■■■ We have already determined there is sufficient evidence to support the trial court's finding that Longaker breached his fiduciary duty to Marion. The question that remains is whether that breach caused damage to the estate in the amount of $550,000 in estate taxes.

There is no causal relationship between the termination of the trust and any additional tax liability to the estate. McEntire, who had been Marion's financial advisor, testified Longaker precluded Marion from obtaining the benefit of his financial planning expertise. There is no evidence, however, that Marion ever intended to adopt McEntire's financial plan. In fact, the only evidence is to the contrary. Marion ordered the bank, in writing, to terminate the trust and told attorney Kerr she wanted to manage the assets herself.

Marion was free to terminate Trust A in the face of warnings that to do so would cause adverse tax consequences to her estate. Quite understandably, Evans complains that this action was not prudent and, incidentally, substantially reduced his beneficial interest in the estate. But even if Marion acted on bad advice from Longaker in terminating the trust, all indications are it was what she wanted and there is no evidence of a contrary intent or that she could have been persuaded to change her mind. *See Thompson v. Deloitte & Touche, L.L.P.,* 902 S.W.2d 13, 16 (Tex. App.—Houston [1st Dist.] 1995, no writ) (no cause of action in Texas for lost opportunity to prevent someone from changing his will).

Any interpretation of this record that Longaker thwarted Marion from carrying out the McEntire plan amounts to no more than speculation. As such, it fails as a matter of law to support the necessary causal link between Longaker's actions and any alleged loss to the estate. We conclude there is no evidence to support

the estate's claim of damages due to any breach of a professional duty by Longaker.

### MUTUAL FUNDS AND MUNICIPAL BONDS

 Finally, Longaker challenges the probate court's conclusion that certain municipal bonds and mutual funds were not covered by the term "corporate stocks and bonds," which Marion bequested to him in her will. Neither party contends the provision in Marion's will governing this distribution is ambiguous. We therefore look only to the testamentary instrument to decide this issue. *See Henderson v.. Parker*, 728 S.W.2d 768, 770 (Tex.1987); *Opperman v. Anderson*, 782 S.W.2d 8, 10 (Tex.App.—San Antonio 1989, writ denied). To ascertain Marion's intent at the time she executed her will, we examine only the language used within the four corners of the document and harmonize the document's provisions so as to give each its proper effect. *See Henderson*, 728 S.W.2d at 770; *West Tex. Rehab. Ctr. v. Allen*, 810 S.W.2d 870, 873 (Tex.App.—Austin 1991, no writ).

According to Marion's 1995 will, Longaker was to inherit (1) "any Certificates of Deposit in banks;" (2) "any United States issued securities: bonds, bills and notes;" and (3) "any corporate stocks and bonds not in present trust." At the time of her death, Marion held financial interests in the Colonial Group Mutual Fund, the Fidelity Municipal Bond Fund, and bonds issued by the City of El Campo, Texas. Although these assets are mentioned in Marion's will, they are not itemized according to the terminology Marion used in her specific bequests.

Generally, corporate stock refers to securities issued by a corporation. *See* BLACK'S LAW DICTIONARY 307 (5th ed.1979). Corporate bonds are debt instruments issued by a corporation. *See id.* at 306. A mutual fund is "an investment company that raises money by selling its own stock to the public and investing the proceeds in other securities, with the value of its stock fluctuating with its experience with the

securities in its portfolio." *Id.* at 920. Finally, a municipal bond fund is a mutual fund that invests the proceeds of its stock sales in municipal bonds, which are "evidences of indebtedness issued by cities or other corporate public body, negotiable in form, payable at designated future time, and intended for sale in market with object of raising money for municipal expense." *Id.* at 917.

According to these common definitions, the Fidelity Municipal Bond Fund, the Colonial Group of Mutual Funds, and the City of El Campo, Texas municipal bonds properly fit into the category of "corporate stock and bonds." Under Marion's 1995 will, Longaker is thus entitled to receive Marion's interest in the Fidelity Municipal Bond Fund, the Colonial Group Mutual Fund, and the municipal bonds issued by the City of El Campo, Texas.

### CONCLUSION

Evans insists that a grave miscarriage of justice will occur if the former trust assets are awarded to Longaker instead of to him because Marion intended for Evans to have the assets of Trust A. Indeed, he may actually be correct. Certainly Longaker's conduct, particularly the apparent self-dealing, raises a serious concern that his motives when dealing with Marion and her property may not have been pure. But if Marion's intentions were thwarted by Longaker's improper influence and manipulation of her estate, the record does not show it. Instead, the record consists largely of innuendo. There is no evidence rising above a scintilla that Longaker unduly influenced Marion to terminate Trust A for his own gain. Only through speculation can it be concluded that when Trust A was terminated Marion did not intend to redirect the trust assets from Evans to Longaker. And as much as the circumstances make it appear that Longaker may have manipulated Marion's estate to benefit himself, any conclusion to that effect must be based on more than mere specula-

tion. There must be some evidence to support it, and we have found none.

Accordingly, having determined the trial court erroneously awarded assets based on conduct and damages that were not established, we next consider to whom these assets should properly be awarded.

 The disposition of a probate asset depends on its nature on the date of the testator's death and title vests in the beneficiary upon the testator's death. TEX. PROB.CODE ANN. § 37 (Vernon Supp. 1999); *accord Kelley v. Marlin,* 714 S.W.2d 303, 305–06 (Tex.1986). On the day Marion died, her money market funds were held by Longaker in an account under his name; however, it is undisputed the funds belonged to Marion. Because Marion's 1995 will bequeathed Longaker the "cash in banks not involved in existing trusts," Longaker is entitled to receive the treasury bills that were purchased with this cash, along with any cash remaining in the money market fund account.

 The securities formerly held as Trust A assets are non-probate assets because they were held in a joint brokerage account with survivorship rights on the day Marion died. Accordingly, the securities pass to Longaker outside of probate since he is the survivor of the joint tenancy account.

In conformity with the above, the trial court's judgment is reversed in part and judgment is rendered that Longaker receive (1) the $557,603.75 transferred by Longaker out of Marion's money market account, invested in U.S. Treasury bills in the face value of $570,000.00, plus income; (2) the securities held in the Frost Bank brokerage account, plus income; (3) the Fidelity Municipal Bond Fund account; (4) the Colonial Group Mutual Funds account; and (5) the City of El Campo, Texas municipal bonds. The remaining provisions of the trial court's judgment are affirmed.