## BAKER BOTTS, L.L.P. and Wells Fargo Bank Texas, N.A., Appellants/Cross–Appellees,

v.

## Kenneth F. CAILLOUX, as Next Friend of Kathleen C. Cailloux, Appellee/Cross–Appellant.

### No. 04–05–00446–CV.

Court of Appeals of Texas,
San Antonio.

Feb. 14, 2007.

David M. Gunn, David J. Beck, Jeff M. Golub, Russell S. Post, Eric J.R. Nichols, Beck, Redden & Secrest, L.L.P., Dana G. Kirk, Kirk Law Firm, Houston, Dean V. Fleming, W. Wendell Hall, Rosemarie Kanusky, Michael W. O'Donnell, Stephen J. Romero, Fulbright & Jaworski L.L.P., San Antonio, Ben Taylor, Fulbright & Jaworski L.L.P., Dallas, David E. Keltner, The Keltner Law Firm, Fort Worth, WM. Michael Childers, Kerrville, for appellants.

Rick Harrison, Bruce Perkins, Dale Roberts, Fritz, Byrne, Head & Harrison, L.L.P., Randy R. Howry, Herman, Howry & Breen, L.L.P., Austin, Donald P. Dorsey, Donald P. Dorsey Law Office, Richard C. Mosty, C. Dixon Mosty, Mosty Law Firm, P.C., Stephen B. Schulte, Stephen B. Schulte, P.C., Kerrville, Dan Pozza, San Antonio, for appellee.

Randy R. Howry, for William Goertz.

Sitting: ALMA L. LÓPEZ, Chief Justice, CATHERINE STONE, Justice, KAREN ANGELINI, Justice.

## OPINION

CATHERINE STONE, Justice.

Floyd and Kathleen Cailloux hired Baker Botts, L.L.P., to devise an estate plan for their multimillion dollar estate. Floyd died before Baker Botts could finish all stages of the Caillouxes' estate plan. Baker Botts designed a revised estate plan for Kathleen immediately following her husband's death. Under the revised plan, Kathleen voluntarily disclaimed her right to her husband's share of the marital estate. As a result of Kathleen's disclaimer, $65.5 million vested immediately in various charitable organizations Floyd had designated in his will.

Kathleen subsequently became incapacitated by Alzheimer's disease, and her son, Ken Cailloux, took over her affairs. More than six years after Kathleen disclaimed her husband's estate, Ken, as next friend of Kathleen, sued Baker Botts as well as the executor of Floyd's estate, Wells Fargo Bank, N.A., for, among other things, breach of fiduciary duty relative to Kathleen's execution of the disclaimer. A jury found that both Baker Botts and Wells

Fargo had breached their fiduciary duties to Kathleen. The jury further found that $65.5 million is the value Kathleen would have received in trust had she not disclaimed her right to Floyd's estate, but determined that Kathleen had zero "lost income" damages and zero "economic loss" damages as a result of executing the disclaimer. Based on the jury's findings, the trial court, relying on its equitable powers, created a $65.5 million "equitable trust" through its judgment to benefit Kathleen. This "equitable trust" was to be funded by Baker Botts and Wells Fargo and was similar to the trust that would have existed had Kathleen not executed the disclaimer.

Baker Botts and Wells Fargo appeal the trial court's judgment, claiming, *inter alia*, that: (1) there is insufficient evidence to support the jury's findings that their alleged breaches of fiduciary duty proximately caused Kathleen damage; and (2) the trial court had no power to create an "equitable trust" under the circumstances presented. Ken also appeals the trial court's judgment, claiming there is insufficient evidence to support the jury's zero finding for lost income. After reviewing the record and the parties' contentions, we agree with Baker Botts and Wells Fargo. We therefore reverse the trial court's judgment to the extent that it imposes a $65.5 million "equitable trust" on Baker Botts and Wells Fargo, and render a take nothing judgment in favor of Baker Botts and Wells Fargo. To the extent that the trial court's judgment awards Ken nothing for Kathleen's lost income damages, we affirm the judgment of the trial court.

## BACKGROUND

On January 21, 1997, Floyd unexpectedly died after angioplasty surgery, leaving behind his wife, Kathleen, son, Ken, daughter, Paula Heileman, and grandson, Stephen Andresakis. Before Floyd died, he and his wife had hired Baker Botts, L.L.P. to develop a comprehensive estate plan for their vast fortune, which was valued at more than $100 million. Baker Botts attorneys Stacy Eastland and Stephen Dyer were the attorneys responsible for assisting the Caillouxes with their estate planning.

Baker Botts performed the Caillouxes' estate planning in stages. The first stage started in 1994 when Baker Botts prepared a set of mirror-image wills for the Caillouxes. The wills named Wells Fargo Bank as the executor of the Caillouxes' estate and as the trustee under the associated trusts.[1] Baker Botts also established a foundation (the "Old Foundation") for the Caillouxes that would serve as a vehicle for making grants to charity. At Floyd's direction, his family members were named as officers of the Old Foundation, but the directors who would actually run the foundation were local businessmen. The executive director of the foundation was Floyd's friend, William (Bill) Goertz, the regional president of Wells Fargo Bank.[2]

During 1995–96, the Caillouxes' estate planning entered its second phase when Baker Botts prepared a new pair of wills for the Caillouxes. Under Floyd's will, his estate funded a trust that would provide Kathleen with income for life. Upon Kath-

---

1. The will actually named Norwest Bank Texas, Kerrville, N.A. as the executor/trustee, which later became Wells Fargo after the bank changed ownership.

2. Goertz was president of the First National Bank of Kerrville, who later became a regional president of Norwest Bank Texas, Kerrville and then Wells Fargo as the bank changed ownership over the years. The ethics committee of Goertz's bank sanctioned his volunteer work as a director of the Old Foundation.

leen's death, $10 million would pass to several "issue" trusts the Caillouxes had established in 1976, 1981, and 1987 to provide for Ken, Paula, and Stephen (collectively the "children") with the remainder of the estate passing to charity: 4% to Shreiner's hospital; 2% to M.D. Anderson Cancer Center; 2% to Schreiner University; and 92% to the Old Foundation. Floyd's will also gave Kathleen a "5X5 right," an option to annually withdraw $5,000 or 5% of the trust's principal. As with prior wills the Caillouxes had executed, Floyd's will gave Kathleen a testamentary "power of appointment" that allowed her to redirect Floyd's estate to other charities or to their children through her own will if she so chose. Finally, Floyd's will allowed Kathleen to disclaim her interests in Floyd's estate. The terms of Floyd's will were mirrored in the will signed by Kathleen for Floyd's benefit, including the $10 million bequest to the issue trusts. Baker Botts also created a family limited partnership for the Caillouxes. This partnership was designed to allow the Caillouxes to transfer substantial wealth to the children while minimizing income and estate taxes.

Baker Botts was on the verge of its final phase in the Caillouxes' estate plan, which was to implement a grantor-retained annuity trust arrangement and to begin transferring the Caillouxes' wealth to the children via the family limited partnership,

when Floyd died on January 21, 1997. At the time of Floyd's death, the Caillouxes' community estate was worth $130 million. Given the status of the Caillouxes' estate planning, Kathleen's estate would face an estate tax bill of approximately $32 million if she were to die with the remaining work unfinished.[3]

Pursuant to Floyd's will, Wells Fargo became the independent executor of Floyd's share of the marital estate. Wells Fargo subsequently contacted Baker Botts to represent the bank in connection with the administration of Floyd's estate. The Old Foundation also contacted Baker Botts to retain the firm to assist it with any issues that arose from Floyd's death. Because Baker Botts realized that representing Kathleen, in her continued estate planning and as beneficiary of Floyd's estate, while simultaneously representing Wells Fargo and the Old Foundation raised the potential for conflicts of interest between Kathleen, Wells Fargo, and the Old Foundation, the law firm sent engagement letters to Kathleen, Wells Fargo, and the Old Foundation notifying them of the potential for conflict between them.[4] The engagement letters provided:

> There is a clear conflict of interest in our joint representation of the personal representative of an estate and a beneficiary of the estate. It is thus quite possible that our undertaking to repre-

---

**3.** This is due in large part to the $10 million in testamentary gifts Kathleen and Floyd each intended to make to the children in their wills.

**4.** Baker Botts did not send the letter directly to Kathleen. Instead, Eastland (Baker Botts) forwarded a copy of the letter to Wes Dorman (Wells Fargo) for Kathleen along with a cover letter stating, "we clearly in this situation will be representing multiple parties with potentially adverse interests and, therefore, must obtain written consent from each such party prior to undertaking the common representa-

tion of all of them," and "I will rely on you to forward the letters to [Kathleen] and to discuss the joint representation with her." Dorman, however, did not discuss the joint representation or potential conflicts with Kathleen as Eastland had requested because he knew nothing about Floyd's will or estate planning *and did not feel that it was his responsibility* to do so. Thus, the only explanation Kathleen received concerning the joint representation/conflicts issue came from the engagement letter.

sent you jointly in connection with the Subject Matter could present a situation in which your interests are materially and directly adverse or our responsibilities to one of you could become adversely limited by our responsibilities to the other.

The letter also advised:

By retaining [Baker Botts] and simultaneously acknowledging our potentially conflicting representation of the two of you, the Foundation, and Mrs. Cailloux (as to her estate planning) as described above, you represent that you do not consider your interests in connection with the Subject Matter to be materially and directly adverse to each other, nor to those of the Foundation, nor to those of Mrs. Cailloux in connection with her estate planning. You also represent that you do not consider our joint representation of you nor our concurrent representation of the Foundation and Mrs. Cailloux to be inappropriate, and you consent thereto. By its signature hereto, the Foundation, likewise represents and consents thereto.

Since we will be representing you jointly and also will be representing Mrs. Cailloux as to her estate planning and the Foundation, each of you would be our client and, as a result, matters which one of you might discuss with us may not be protected by the attorney-client privilege from disclosure to the others. In order to represent you properly, we also cannot agree with any of you to withhold information from any other client.

The letters further requested that each potential client consent to the joint representation by the law firm. Kathleen, Wells Fargo, and the Old Foundation each signed the letter, consenting to joint representation by Baker Botts.

On February 13, 1997, Wells Fargo hosted a meeting for the Cailloux family and Baker Botts in Galveston, Texas to discuss "the estate process" and "the process relating to future planning." Attending the meeting were Wes Dorman, Sandy Modisett, and John Rogers, as representatives of Wells Fargo; Goertz, as the representative of the Old Foundation; Eastland and Dyer, as representatives of Baker Botts; and the children. Although Kathleen was not present, Ken planned to tape record the meeting for his mother.[5]

At the meeting, Modisett and Rogers provided handouts to those in attendance detailing the Cailloux family's bank and trust accounts. Eastland, on the other hand, outlined Floyd's estate planning goals for those in attendance. Eastland stated that Floyd's goals were to: (1) provide for his wife Kathleen; (2) provide for the children; (3) provide for his favorite charitable organizations; and (4) minimize taxes. Eastland further discussed the general terms of Floyd's will and the anticipated tax consequences from Floyd's death, which were anticipated to be minimal due to the marital deduction afforded to his estate. Finally, Goertz, to Ken's dismay, announced that Ken would not be the successor of his father's seat on the board of directors of the Old Foundation.[6]

5. The tape, however, was lost sometime after Kathleen heard the tape but before this litigation ensued.

6. The record reveals that the meeting became intense after Goertz told Ken that he would not serve on the board of directors because Ken eagerly wanted to join the board of the

Old Foundation. Eastland allegedly expressed concern at this point because he feared a conflict was arising that jeopardized Baker Botts's joint representation of Wells Fargo, the Old Foundation, and Kathleen. Despite this concern, however, Eastland (Baker Botts) continued with the joint representation of Wells Fargo, the Old Foundation, and

In light of the fact that Kathleen's estate, unlike Floyd's, faced a substantial tax burden upon her death due to Floyd's demise before the final phase of the Caillouxes' estate plan was completed, Eastland and Dyer began devising an alternative plan to accomplish the Caillouxes' estate planning objectives. Following the Galveston meeting, Eastland and Dyer conceived of two options to utilize most of the Caillouxes' existing estate plan and still accomplish Floyd and Kathleen's goals. The first option required Kathleen and Floyd's estate (through Wells Fargo, the executor) to withdraw their respective interests in the family limited partnership. The net effect of this withdrawal would be similar to that which would have resulted from the grantor-retained annuity trust Baker Botts intended to establish for the Caillouxes: at least $20 million would be transferred to the children during Kathleen's lifetime. Under option one, Kathleen would also have to exercise her power of appointment under Floyd's will to eliminate Floyd's testamentary gift to the children and execute a new will leaving her entire estate to charity. Adopting this approach would allow Kathleen to receive lifetime benefits from the testamentary trust Floyd established for her benefit and save her estate $32 million in taxes, allowing more money to go to charity upon her death. The second option, like the first, would save taxes on Kathleen's estate with the withdrawal transaction and execution of a new will; however, it passed Floyd's entire estate to his designated charities immediately, rather than years later upon Kathleen's death. Under option two, Kathleen would receive no part of Floyd's estate since she would be required to disclaim all of her rights under Floyd's will, including her lifetime income and 5X5 rights to the testamentary trust and her power of appointment. By adopting option two, and relying on her own substantial wealth for income, Kathleen would gain the benefit of seeing that charitable gifts were made during her lifetime. Also, Kathleen reduced the risk of an IRS audit concerning her estate when she died.

On February 24, 1997, prior to speaking to Kathleen, Eastland spoke to Goertz (the Old Foundation) about Kathleen's power of appointment and the two potential options available to Kathleen regarding her estate. During their conversation, Eastland indicated to Goertz that he would advise Kathleen to pursue option two. Eastland and Dyer devised an "option memo" for Kathleen following the conversation with Goertz, which detailed the two options available to Kathleen. With respect to option two, the memo provided:

*Everybody Executes a Disclaimer to Benefit Charity Immediately and Possibly to Obtain Greater Involvement at the Foundation.* Mrs. Cailloux and [Wells Fargo], joined by Kenneth, Paula, and [Stephen] ... disclaim their interests under Mr. Cailloux's estate, such that his estate passes directly to the charity beneficiaries under his will ... The disclaimer will get funds into the [Old Foundation] much sooner and should give the family members who are

---

Kathleen. The record also reveals that Goertz made several comments to Rogers and Dorman (Wells Fargo) at the conclusion of the meeting, which neither Rogers nor Dorman made known to Kathleen or the members of her family. For example, Dorman and Rogers did not disclose to Kathleen and her family that Goertz had remarked to them that "he felt the [Cailloux] family had enough money and that [Wells Fargo and the Old Foundation] needed to move forward in getting the [Old Foundation] funded in an efficient manner."

interested some bargaining leverage for more participation in the affairs of the foundation.[7]

Eastland and Dyer, however, decided to revise the option memo to provide:

> The second plan described below would shift a significant amount of assets to charity right away, including the [Old Foundation]. Mrs. Cailloux, Kenneth, Paula, and [Stephen] would be able to enjoy the gratitude of the charities and possibly could become more involved with the foundation as a result of this plan.... *Everybody Executes a Disclaimer—Value Passes to Charity Immediately and Family Possibly Increases Involvement at the Foundation.* Mrs. Cailloux and [Wells Fargo], joined by Kenneth, Paula, and [Stephen] ... disclaim their interests under Mr. Cailloux's estate, such that his estate passes directly to the charity beneficiaries under his will ... The disclaimer will get funds into the various charities and the [Old Foundation] much sooner.

Eastland and Dyer forwarded the revised version of the option memo to Goertz, Rogers, and Dorman on February 28, 1997, and invited them to call with their comments. Kathleen, however, was not forwarded a copy of the revised option memo at this time. On March 3, 1997, Eastland and Dyer spoke to Rogers and Goertz regarding the option memo. Eastland and Dyer learned during the conversations that Wells Fargo was of the opinion that Kathleen should pursue whatever option she wanted so long as the probate court approved her course of conduct. Eastland and Dyer decided to revise the option memo yet again following their conversations with Rogers and Goertz. This time, they deleted the following statement from their memo: "and possibly could become more involved with the foundation."

On March 5, 1997, Eastland met Dorman and Ken for breakfast. Eastland provided Ken with a copy of the option memo during the meeting. Ken read the document several times and asked Eastland for his recommendation. Eastland indicated that he favored option two because, among other things, it avoided taxes and the charities might honor the gifts with naming rights. Later that morning, Eastland, Dorman, and Ken attended a court hearing where Floyd's will was admitted to probate. Later that same day, Eastland met with Kathleen, Ken, and Dorman to discuss Kathleen's future estate planning in light of the option memo.

During this meeting, Kathleen indicated that Ken would act as her representative regarding the details of her estate planning. Kathleen also informed Eastland that she did not have any disagreements with Wells Fargo or the Old Foundation that would require Baker Botts to withdraw from its joint representation of them. Kathleen further told Eastland that her primary estate planning goal was to take care of the children. After that was accomplished, she wanted to make gifts to various charitable organizations, which could take place either during her lifetime or upon her death. Finally, Kathleen indicated that she wanted to save taxes. As for her power of appointment, Kathleen noted that she "had too much respect for [her husband] to change what he did with his assets and she wanted to follow his wishes." Eastland also discussed the family partnership with Kathleen, telling her that if she and Wells Fargo agreed to the

---

7. Dyer testified he included such language in the option memo for the benefit of Ken: "I put that in there because if somebody gives money to charity, they might be able to get some involvement. Sure we knew that Ken wanted to be involved with the foundation. And so this was primarily for Ken."

withdrawal transaction, anywhere from $20 million to $80 million would go to the children's trusts immediately. Although the withdrawal transaction might reduce the value of her estate, Eastland told Kathleen that it would save her estate approximately $32 million in taxes upon her death.

Two days later, on March 7, 1997, Eastland sent Kathleen a letter providing as follows:

> Also, as you requested, and by copy of this letter, I am sending Paula and [Stephen] a copy of the memorandum we discussed which explains the proposed plan. As you recall, [option two] is the plan you and [Wells Fargo] have decided to pursue. We will send drafts of the applicable documents to you on or about March 12–14.

Eastland wrote Kathleen another letter on March 13, 1997, reconfirming Kathleen's decision to pursue option two. The letter provided Kathleen with drafts of the disclaimer and her new will and briefly explained the nature of the documents to Kathleen. Eastland also offered in the letter to meet with Kathleen to discuss the documents further. This letter was followed by others, which included drafts of documents made in response to comments by Kathleen. For example, Kathleen requested Baker Botts to create the Kathleen Cailloux Family Foundation (the "New Foundation"), which gave the children board positions with discretion to support charities other than those Kathleen designated, and had Baker Botts revise her will to leave her entire estate to the New Foundation and other designated charitable organizations. Neither Wells Fargo nor the Old Foundation received copies of these correspondence from Eastland.[8]

On April 1, 1997, Eastland met with Kathleen so that she could execute the disclaimer, the partnership documents implementing her withdrawal from the family partnership, the documents creating the New Foundation, and her new will.[9] Although Kathleen signed the disclaimer, the will specifically exercised her power of appointment under Floyd's will to redirect the children's testamentary gifts to charity. While the new will eliminated the children's prior testamentary gifts, it contained a provisional gift to the children should their trusts be worth less than $51.3 million at the time of Kathleen's death.[10] The entire document signing session took less than 45 minutes to complete.[11]

On April 23, 1997, Kathleen, the children, and Wells Fargo, acting as executor of Floyd's estate, filed a petition in probate court seeking, among other things, a declaratory judgment "regarding the impact of [the disclaimers] on the operation of [Floyd's] will." Kathleen and the children specifically sought a judgment vesting Floyd's estate in the charitable beneficiaries. The probate court declared that

---

8. The record shows that when Baker Botts learned that Kathleen decided to pursue option two, the firm referred the Old Foundation to another law firm for representation because her decision would involve the institution of court proceedings.

9. Like Kathleen, the children also had to execute disclaimers at this time to effectuate Kathleen's estate plan.

10. This provisional gift was unlikely to become effective because the withdrawal transaction transferred $40 million to the children.

11. Notably, Ken's estate planning expert, Tom Pollard, testified that the documents Kathleen executed were complex and it had taken him seven hours to read through them. Pollard stated, "you couldn't adequately discuss all th[ese documents] with a client in 45 minutes."

Kathleen had "disclaimed all of her interest in any part of the residuary estate devised and bequeathed to trusts for her benefit." As a result of the disclaimers, the court determined that Floyd's residuary estate should be distributed to his designated charities.

Around the same time the probate court proceedings were taking place, Wells Fargo, acting as trustee for the children's trusts, filed a second declaratory judgment action in the Kerr County District Court on July 7, 1997. This suit was filed with "respect to the Withdrawal Transaction as it pertains to the inter vivos trusts." The court found that the withdrawal transaction was in the best interest of Floyd's estate and approved the withdrawal. Wells Fargo subsequently distributed Floyd's estate to the Old Foundation and other charities in several installments between the months of April and August 1998.

In May 1998, Ken obtained a signed power of attorney from Kathleen, who had been diagnosed with early-stage Alzheimer's disease on April 29, 1997, to control her affairs. Approximately two years later, in 2000, Ken hired a New York law firm to review Floyd's will and the withdrawal transaction. Ken, with the assistance of counsel, then moved all of the family trust accounts from Wells Fargo to J.P. Morgan Chase Bank, N.A. In 2002, Ken filed suit against the Old Foundation to change the beneficiary of Kathleen's 1994 charitable trust from the Old Foundation to the New Foundation. Although the lawsuit did not concern either Baker Botts or Wells Fargo, Ken obtained, as part of the discovery in the lawsuit, the Baker Botts file pertaining to the previous estate planning services the law firm had provided to his family.

Upon reviewing the files he received from Baker Botts, Ken concluded the files showed evidence of "conspiracy and fraud" on the parts of Baker Botts and Wells Fargo during the course of his family's estate planning. Ken, as next friend of Kathleen, filed suit in August 2003 against Baker Botts and Wells Fargo, raising, among other causes of action, claims of negligence, breach of fiduciary duty, and legal malpractice. The lawsuit essentially claimed that Baker Botts and Wells Fargo had schemed with Goertz to increase funding for the Old Foundation to the detriment of Kathleen and her family.[12] Ken's live petition at the time of trial sought damages in excess of $100 million as well as equitable relief from the trial court.[13]

A jury trial was held before the Honorable Emil Karl Prohl of the 198th Judicial District Court of Kerr, County, Texas. As to Baker Botts, the jury concluded Baker Botts breached its fiduciary duty to Kathleen by failing to "fully and fairly disclose all important information to Kathleen." The jury, however, found in favor of the law firm on all of the other causes of action against it. As to Wells Fargo, the jury found that the bank had breached its fiduciary duties to Kathleen by: (1) failing to fully and fairly disclose all important information; (2) failing to act with the utmost

---

**12.** Goertz was also named as a defendant in the lawsuit; however, he settled before trial in exchange for relinquishing control of the Old Foundation to Ken and his family. The lawsuit also named the children as plaintiffs in the case, but the children eventually nonsuited their claims.

**13.** The petition also requested that Wells Fargo and Baker Botts forfeit all fees and disgorge any profits made in relation to representing the Caillouxes. Ken, however, later abandoned this request. Although Ken's petition also sought broad equitable relief, Ken informed the trial court at an August 30, 2004 pretrial hearing that he no longer planned to seek equitable relief for Kathleen.

loyalty; and (3) failing to act with the utmost good faith and scrupulous honesty. The jury further found that Goertz individually participated in Wells Fargo's breach of fiduciary duty.

With respect to damages, the court's charge asked the jury to determine:

> What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Kathleen C. Cailloux for her damages, if any, which were proximately caused by [the breaches]? ... Consider each of the following elements of damages, if any, and none other: (a) The value that Kathleen C. Cailloux would have received in trust had she not signed the disclaimer ... (b) Lost income that Kathleen C. Cailloux would have received had she not signed the disclaimer ... [and] (c) The economic loss resulting from Kathleen C. Cailloux's inability to take a 5% annual withdrawal of principal from her marital bypass trust.

In answering the damages questions against Baker Botts and Wells Fargo, the jury found that $65.5 million is the value that Kathleen would have received in trust had she not disclaimed Floyd's estate. For Kathleen's lost income from the trust had she not disclaimed, the jury answered "zero." Likewise, for the economic loss of Kathleen's 5X5 right, the jury answered "zero." The jury further apportioned causal responsibility equally among the following: Goertz, individually; Baker Botts; Wells Fargo; and Kathleen (25% each).

In light of the jury's findings, Ken filed a motion for entry of judgment. Although Ken had previously assured the court that he was not seeking equitable relief for Kathleen, his motion for judgment, relying on holdings from constructive trust cases, urged the court to "us[e] its equitable powers" and to place "the award of damages to Plaintiff ... in a Court-created equitable trust under the same or similar terms as those in [Floyd's] Will, except that Wells Fargo [be] disqualified from serving as trustee." The trial court subsequently entered its judgment, essentially recreating the marital trust that Kathleen lost when she disclaimed her husband's estate. The trial court's judgment provides: "In order to place Kathleen C. Cailloux in the position she would have held but for the breach of fiduciary duty by Baker Botts[,] the breach of fiduciary duty by Wells Fargo[,] and had she not signed the disclaimer, this Court, using its equitable powers, awards Kathleen C. Cailloux recovery against Baker Botts and Wells Fargo for the principal of the marital trusts ($65,-500,000) and prejudgment interest ... in the amount of $5,596,735.70." The judgment affords Kathleen the power to exercise her lost 5X5 right during her lifetime and provides that she is entitled to all of the net income of the trust. The trial court's judgment further states that any funds remaining in the "court created equitable trust" be disbursed to the Old Foundation and Floyd's other charities upon Kathleen's death.

Although the jury apportioned causal responsibility equally among Goertz, Baker Botts, Wells Fargo, and Kathleen, the trial court's judgment disregards the jury's percentage of responsibility findings and requires Baker Botts and Wells Fargo to pay the full amount of the judgment. The court's judgment also orders Baker Botts and Wells Fargo to pay court costs in the amount of $61,000 as well as post judgment interest at the rate of 5.25%. The judgment expressly denies any other requests for relief by the parties.

### SUFFICIENCY OF THE EVIDENCE

Baker Botts and Wells Fargo contend that there is insufficient evidence to support the jury's findings that their

alleged breaches of fiduciary duty proximately caused Kathleen damage. *See generally Abetter Trucking Co. v. Arizpe*, 113 S.W.3d 503, 508 (Tex.App.-Houston [1st Dist.] 2003, no pet.) (holding an individual must prove the existence of a fiduciary duty, breach of the duty, causation, and damages to recover on a breach of fiduciary duty cause of action). In reviewing the legal sufficiency of the evidence, we view the evidence in the light favorable to the verdict, crediting favorable evidence that a reasonable fact-finder could and disregarding contrary evidence unless a reasonable fact-finder could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 807 (Tex.2005). Evidence is legally insufficient when: (a) there is a complete absence of evidence of a vital fact; (b) the trial court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove that fact is no more than a mere scintilla; or (d) the evidence conclusively establishes the opposite of the vital fact. *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex.1997).

## A. Wells Fargo

■ After reviewing the record, we conclude that there is no evidence that any of the alleged breaches of duty by Wells Fargo caused Kathleen to disclaim her right to Floyd's estate. The only evidence on the issue of causation is speculative. *See McClure v. Allied Stores of Tex., Inc.*, 608 S.W.2d 901, 903 (Tex.1980) (noting the elements of proximate cause cannot be established by mere conjecture, guess, or speculation). As a result, we must sustain Wells Fargo's sufficiency complaint.

Ken notes on appeal that Wells Fargo breached its fiduciary duties to Kathleen by: (1) failing to explain the implications or risks of the joint representation by Baker Botts; (2) failing to inform her that Goertz was scheming with Baker Botts to dispossess her of the $65.5 million marital trust under the guise of tax savings; and (3) failing to explain the contents of Floyd's will and her rights under the will. Ken argues that had Wells Fargo acted appropriately, Kathleen would not have disclaimed her right to Floyd's estate and would have pursued a different course of action. None of the witnesses who testified at trial, however, had any knowledge of Kathleen's true wishes or intentions. Thus, at best, any assumption about what Kathleen would have done had she known of the purported failures of Wells Fargo is based on nothing more than conjecture.

In *Longaker v. Evans*, this court rejected as mere speculation any assumption as to the decedent's motives or intent when decedent terminated a trust whose proceeds would have benefited her son but instead went to the brother "advising" her to terminate the trust. *Longaker v. Evans*, 32 S.W.3d 725, 734–35 (Tex.App.-San Antonio 2000, pet. withdrawn by agr.). We observed that "while there is much speculation that the trust termination was not the result of [the decedent's] free act, there is no competent evidence that [the beneficiary] wrongfully influenced or otherwise induced [the decedent] to do anything she did not otherwise intend to do." *Id.* at 734. Instead, "all indications are it was what [the decedent] wanted and there is no evidence of a contrary intent." *Id.* at 735. In the absence of competent evidence demonstrating the decedent never intended to divest her son of the trust assets, we determined that it was improper to make that assumption. *Id.* at 734–35. We therefore held there was no evidence of causation or damages. *Id.*

As was the case in *Longaker*, any attempt to infer or assume what Kathleen would have done in this case had she been adequately advised is improper. Ken

claims causation was proven at trial when he testified regarding his recollection that when he and his mother were alone reviewing her will shortly before the execution of her new estate planning documents, Kathleen stated: "I'd just rather leave the money to you and Paula." Such evidence, however, does not constitute evidence that Kathleen would have followed a different course of action and refused to sign the *disclaimer* but for the purported wrongdoing. We would have to engage in impermissible inference stacking to reach Ken's desired conclusion. *See generally Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp.*, 435 S.W.2d 854, 858 (Tex. 1968) (indicating that inference stacking is prohibited).

From the statement Kathleen made to Ken during her review of the will, we would first have to infer that Kathleen was referring not only to the will Ken read to her, but also to her disclaimer and the withdrawal transaction. Next, we would have to infer that Kathleen intended to leave all of her own assets, as well as Floyd's, to the children and not to charities she and Floyd had previously designated. Of course, such inferences would be strained at best in light of ample evidence indicating that Kathleen and Floyd had always intended for their estate plan to balance gifts between the children and charity.

As additional support for his assertion that causation was established as a matter of law, Ken argues that Kathleen's decision to disclaim was "inapposite with logic and human nature" because no individual, given the choice of "keeping their money and the power over it and paying no taxes" or "giving away their money and the power over it and paying no taxes" would choose to divest. Ken's argument, however, ignores that the probate court accepted Kathleen's disclaimer. Although Ken may

have made a different decision than his mother did, such does not render his mother's decision unreasonable as a matter of law. Kathleen was independently wealthy and made a choice to support her husband's charities now, rather than later. We therefore cannot say this particular evidence establishes causation as a matter of law.

Ken also claims the fact that his mother established the New Foundation and executed a new will in 1997 bequeathing her estate to this New Foundation—not the Old Foundation—is further evidence that Kathleen would not have signed the disclaimer but for Wells Fargo's conduct. While this evidence shows that Kathleen wanted her estate distributed to the New Foundation upon her death, we cannot say it is also evidence that she would have redirected Floyd's estate to the New Foundation as well. To make the leap that Kathleen would not have signed the disclaimer from this evidence would once again require us to engage in impermissible inference stacking to reach the desired conclusion. Because Ken has failed to present evidence establishing a causal connection between the acts of Wells Fargo and any harm suffered, we must sustain Wells Fargo's sufficiency complaint.

### B. Baker Botts

█ Like Wells Fargo, Baker Botts contends the record is devoid of evidence on the issue of causation because nothing in the record shows that its breach of fiduciary duty caused Kathleen to disclaim her right to Floyd's estate. Ken's responses to Baker Botts's arguments are essentially the same as those raised in his response to Wells Fargo's causation complaint. Consequently, we reject Ken's contentions for the same reasons expressed

above and sustain Baker Botts's sufficiency complaint.[14]

### THE COURT-CREATED EQUITABLE TRUST

■ Alternatively, even if we were to assume that causation was proven as a matter of law at trial, we would nonetheless hold the trial court abused its discretion by imposing an "equitable trust" upon Baker Botts and Wells Fargo.[15] A constructive trust is an equitable remedy created by the courts to prevent unjust enrichment. *Omohundro v. Matthews*, 161 Tex. 367, 341 S.W.2d 401, 410 (1960); *Hudspeth v. Stoker*, 644 S.W.2d 92, 94 (Tex.App.-San Antonio 1982, writ ref'd). "A constructive trust is a relationship with respect to property, subjecting the person by whom the title to the property is held to an equitable duty to convey it to another, on the ground that his acquisition or retention of the property is wrongful and that he would be unjustly enriched if he were permitted to retain the property." *Talley v. Howsley*, 142 Tex. 81, 176 S.W.2d 158, 160 (Tex.1943); *Bristol v. Placid Oil Co.*, 74 S.W.3d 156, 158 (Tex.App.-Amarillo 2002, no pet.); *see also* George Gleason Bogert & George Taylor Bogert, THE LAW OF TRUSTS AND TRUSTEES § 471 (rev.2d ed. 1983) ("The constructive trust may be defined as a device used by chancery to compel one who unfairly holds a property interest to convey that interest to another

to whom it justly belongs."). A constructive trust is justified when one party commits fraud or, as here, breaches a fiduciary relationship. *Meadows v. Bierschwale*, 516 S.W.2d 125, 128 (Tex.1974); *In re Marriage of Nolder*, 48 S.W.3d 432, 434 (Tex.App.-Texarkana 2001, pet. denied). "When a party in such a situation retains title to property and is unjustly enriched by his actions with that property, the creation of a constructive trust is an appropriate remedy." *Nolder*, 48 S.W.3d at 434.

■ A constructive trust's "scope and application, within some limitations, is generally left to the discretion of the court imposing" it. *Wheeler v. Blacklands Production Credit Assoc.*, 627 S.W.2d 846, 849 (Tex.App.-Fort Worth 1982, no writ). Because imposition of a constructive trust constitutes an equitable remedy, we review the trial court's decision to impose a constructive trust under an abuse of discretion standard. *Leach v. Conner*, No. 13–01–468–CV, 2003 WL 22860911, *7 (Tex. App.-Corpus Christi 2003, no pet.) (mem. op.). A trial court abuses its discretion in matters of equity when it rules: "(1) arbitrarily, unreasonably, or without regard to guiding legal principles; or (2) without supporting evidence." *Id.*

■ The record shows that neither Baker Botts nor Wells Fargo holds legal

---

14. With respect to Baker Botts, however, Ken also claims that he is "not required to prove that [Kathleen] would have made another choice in order to prove causation." We are unpersuaded by this contention. *See Longaker*, 32 S.W.3d 725 at 734 (reversing award of damages for breach of fiduciary duty because plaintiff was "unable to show that [defendant's] conduct . . . caused any harm.").

15. The trial court called the trust it created a "Court-created equitable trust" in its judgment. Regardless of the label the trial court placed on the trust in question, the "equitable trust" imposed by the court was effectively a

"constructive trust." *See generally Fitz-Gerald v. Hull*, 150 Tex. 39, 237 S.W.2d 256, 262 (1951) (citing Pomeroy, EQUITY JURISPRUDENCE, 'Constructive Trusts', Vol. 4, p. 93, [§ ] 1044) (recognizing that " '[c]onstructive trusts include all those instances in which a trust is raised by the doctrines of equity for the purpose of working out justice in the most efficient manner, where there is no intention of the parties to create such a relation, and in most cases contrary to the intention of the one holding the legal title, and where there is no express or implied, written or verbal, declaration of trust.' ").

title to the assets that would have been placed in the marital trust had Kathleen not disclaimed; those assets went to Floyd's designated charities. Ken's damage expert, Cary Ferchill, made it clear at trial that the $65.5 million that forms the basis of the trial court's judgment is the trust principal that was already distributed to charity:

> Q. Now, let's talk about damage Item A, what in your opinion it would take to restore the trusts?
>
> A. Okay. Floyd's will provided that all of his assets from his estate would be distributed to the marital trusts. And so we reviewed the historical financial records of the—of Floyd's estate, which were kept by Wells Fargo, and determined that the amount of roughly $65.5 million was distributed from his estate. That was the full amount of the estate [that] was distributed. It was $65.5 million. . . .
>
> Q. Given the fact that Kathleen had disclaimed from the estate, where did these distributions go? To who did they go?
>
> A. Well, those distributions were actually made to the default beneficiaries that were discussed before. You know, 92 percent of it was to the [O]ld [F]oundation, and 8 percent of it was to a set of designated other charitable beneficiaries.

In short, neither Baker Botts nor Wells Fargo holds legal title to the trust principal. The creation of a constructive trust was thus not an appropriate remedy in this case.[16] Because neither Baker Botts nor Wells Fargo holds legal title to the trust principal, the trial court had no basis in law or fact to impose a constructive trust upon the bank or the law firm.

Ken nevertheless claims the trial court's imposition of an "equitable trust" was proper under the circumstances, citing *Watson v. Limited Partners of WCKT, Ltd.*, 570 S.W.2d 179 (Tex.Civ.App.-Austin 1978, writ ref'd n.r.e.). *Watson*, however, is a restitution case requiring a defendant to forfeit funds received from the plaintiffs under the rule that "the fiduciary must account for all he has received." *See Watson*, 570 S.W.2d at 182. Thus, *Watson*, unlike this case, is a case about "forfeiture" of ill-gotten gains. *See Burrow v. Arce*, 997 S.W.2d 229, 239–40 n. 35 (Tex. 1999) (citing *Watson* for proposition that it is a forfeiture case). Nothing in *Watson* suggests that trial courts have discretion to fabricate an "equitable trust" outside the limits of a constructive trust.

█ We are further troubled by the "equitable trust" fashioned by the trial court because it essentially places Kathleen in a better position than she previously occupied. *See generally Edwards v. Strong*, 147 Tex. 155, 213 S.W.2d 979, 982 (1948) (stating that plaintiffs seeking equi-

**16.** *See Nolder*, 48 S.W.3d at 434. The record reveals that Baker Botts sought to join as parties the charities which benefited from Kathleen's execution of the disclaimer before trial, but Ken opposed the addition of the parties, telling the court: "But, no, the Plaintiffs are not suing the charities. The Plaintiffs are not chasing that money. We elected a remedy. We could have sought to have a construct[ive] trust imposed on that money when it went that way. But we elected the legal remedy of damages from Baker Botts and Wells Fargo." Had the charities been added as parties, however, Ken could have sought a constructive trust on the trust principal that the charities received as a result of Kathleen's disclaimer. *See* George Gleason Bogert & George Taylor Bogert, THE LAW OF TRUSTS AND TRUSTEES § 471 (rev.2d ed.1983) ("if the trust property or its product can be traced into the hands of a third party, a constructive trust may be imposed upon the property in the hands of the third party unless he is a bona fide purchaser for value without notice.").

ty "should not ask the court to do more than put them in as good position as they would have occupied"). The court's "equitable trust" effectively allows Kathleen to benefit in ways she otherwise would not have benefited before the exercise of her disclaimer. The record indicates that by disclaiming Floyd's estate, Kathleen gained the benefit of making a substantial charitable gift ($65.5 million) during her lifetime, reduced the risk of an IRS audit concerning her estate upon her death, and virtually eliminated her estate's tax liability upon her death. With the creation of the court's "equitable trust," not only will Kathleen still receive the aforementioned benefits, but now she will also receive: (1) all net income from the new trust; (2) the right to withdraw either $5,000 or an amount not to exceed 5% of the trust principal each year; and (3) the satisfaction of knowing that Floyd's charities will receive an additional gift of the remaining trust principal upon her death. Thus, the court-created equitable trust cannot stand.

### CONCLUSION

In light of Ken's failure to prove causation, we must reverse the judgment of the trial court and render a take nothing judgment in favor of Baker Botts and Wells Fargo. Because the failure to prove causation is dispositive, we need not reach the merits of the cross appeal. Therefore, to the extent that the trial court's judgment awards Ken nothing for Kathleen's lost income damages, the judgment of the trial court is affirmed.