IN THE SUPREME COURT OF TEXAS








IN THE SUPREME 
COURT OF TEXAS
════════════
No. 07-0697
════════════
Paul H. Smith, et al., 
Petitioners,
v.
Thomas O’Donnell, 
Executor of the Estate of Corwin Denney, Respondent
════════════════════════════════════════════════════
On 
Petition for Review from the
Court of Appeals for the Fourth District of 
Texas
════════════════════════════════════════════════════
 
Argued September 
10, 2008
 
 
            
Justice Willett, joined by 
Justice Wainwright, 
dissenting.
 
 
            
This legal-malpractice appeal turns on whether Belt[1] or Barcelo[2] should control. Decided a decade apart, 
both decisions have their place in our jurisprudence — Barcelo states the 
general rule (non-clients cannot file malpractice suits), Belt the 
exception (executors sometimes can). Unlike the Court, I believe today’s case is 
governed by Barcelo’s general privity barrier, as it is rife with 
Barcelo-like concerns of divided loyalties and conflicts of interest. 
Indeed, this case presents exactly the sort of gamesmanship flagged in 
Belt, “an opportunity for some disappointed beneficiaries to recast a 
malpractice claim for their own ‘lost’ inheritance, which would be barred by 
Barcelo, as a claim brought on behalf of the estate.”[3]
            
A lawyer’s focus should be stubbornly client-focused, concerned with 
today’s representation of satisfied clients, not tomorrow’s litigation from 
dissatisfied critics. The Court’s decision, I fear, sends this troubling 
message: caveat advocatus–zealously represent 
your client at your own risk. It’s hard to be zealous while nervous. For the concerns expressed in Barcelo (and echoed in 
Belt), I would affirm the trial court’s summary judgment for Cox & 
Smith.
I. Barcelo and Belt Revisited
            
Barcelo held that trust beneficiaries lacked privity with the trustor’s attorney and therefore had no claim for legal 
malpractice.[4] The Court reaffirmed the general Texas 
rule that an attorney’s professional duty of care extends only to his client, 
and declined to recognize an exception to the privity barrier applicable “in the 
estate planning context.”[5] The Court’s chief rationale was that 
relaxing the privity rule might create conflicts of interest that would 
discourage lawsuit-wary attorneys from acting solely and zealously on behalf of 
their clients:
 
Such a 
cause of action would subject attorneys to suits by heirs who simply did not 
receive what they believed to be their due share under the will or trust. This 
potential tort liability to third parties would create a conflict during the 
estate planning process, dividing the attorney’s loyalty between his or her 
client and the third-party beneficiaries. . . .
            

            
. . . .
We believe 
the greater good is served by preserving a bright-line privity rule which denies 
a cause of action to all beneficiaries whom the attorney did not represent. This 
will ensure that attorneys may in all cases zealously represent their clients 
without the threat of suit from third parties compromising that 
representation.[6]
 
            
In Barcelo, we did not identify an actual conflict of interest 
between the third-party beneficiaries and the attorney. Our decision to adopt a 
bright-line rule must therefore be read as based on the mere possibility 
of conflicts of interest between the client trustor or 
testator and the third-party beneficiary.
            
Belt, on the other hand, held that independent executors of an 
estate could sue an estate-planning attorney for injury to the estate as a 
whole.[7] The alleged injury to the estate in 
Belt was a substantial and avoidable estate-tax liability.[8]
            
A critical distinction between Belt and Barcelo is that in 
Belt the interests of the testator, the estate, the executors, and the 
heirs were aligned. In Belt, we respected and reconciled Barcelo 
by emphasizing that the potential conflicts of interest that concerned us in 
that case were absent in Belt:
 
[I]n 
Barcelo, we held that an attorney’s ability to represent a client 
zealously would be compromised if the attorney knew that, after the client’s 
death, he could be second-guessed by the client’s disappointed heirs. 
Accordingly, we held that estate-planning attorneys owe no professional duty to 
beneficiaries named in a trust or will.
 
While this 
concern applies when disappointed heirs seek to dispute the size of their 
bequest or their omission from an estate plan, it does not apply when an 
estate’s personal representative seeks to recover damages incurred by the estate 
itself. Cases brought by quarreling beneficiaries would require a court to 
decide how the decedent intended to apportion the estate, a near-impossible task 
given the limited, and often conflicting, evidence available to prove such 
intent. In cases involving depletion of the decedent’s estate due to negligent 
tax planning, however, the personal representative need not prove how the 
decedent intended to distribute the estate; rather, the representative need only 
demonstrate that the decedent intended to minimize tax liability for the estate 
as a whole.
 
Additionally, while the 
interests of the decedent and a potential beneficiary may conflict, a decedent’s 
interests should mirror those of his estate. Thus, the conflicts that concerned 
us in Barcelo are not present in malpractice suits brought on behalf of 
the estate.[9]
 
II. The Barcelo Privity Barrier Should Govern this 
Case
            
Today’s case should fall under the Barcelo privity barrier because 
conflicts of interest abound. While this case has a slightly altered procedural 
posture—suit filed by the executor, not the beneficiaries directly—there is 
little confusion that the executor is a pass-through, essentially bringing the 
children’s claims in the estate’s name. The trust 
beneficiaries had interests that directly conflicted with the interests of 
Corwin Denney, the client. The trust was established at the death of Denney’s 
second wife, Des Cygne, pursuant to her will. Every 
asset that went into Des Cygne’s trust was an asset 
that Denney could not treat as his separate property and spend or otherwise use 
as he wished. Barcelo’s central holding is that this conflict of interest 
necessarily means that trust beneficiaries do not share privity with the 
client’s attorneys, who should focus solely on the client’s best interests and 
wishes.
            
The trust beneficiaries, Denney’s children, could have sued Denney during 
his lifetime for failing to adequately fund Des Cygne’s trust with her rightful share of the couple’s 
community property. The beneficiaries declined to do so, almost surely aware 
that Denney would have vigorously contested any characterization of the 
Automation Industries stock as community property and that he would have offered 
evidence of an oral agreement with Des Cygne that all 
the stock was his separate property. Nor did the beneficiaries sue Denney’s 
attorneys after Denney’s death. If they had, they would have lost under 
Barcelo. Instead, they waited thirty-four days after their father died 
and sued his estate. The executor, O’Donnell, raised no limitations defense but 
instead settled with the beneficiaries for generous sums.[10] He then sued Cox & Smith for 
malpractice, essentially taking the position that Denney’s attorneys should have 
persuaded him, against his strong and repeated wishes, to surrender more assets 
to Des Cygne’s trust. So we have a Barcelo suit 
draped in Belt garb. I would disallow the legal makeover.
            
The record is clear that Denney believed that all the Automation 
Industries stock was his separate property and that he opposed funding the trust 
with this prized asset. O’Donnell, with nothing to win or lose personally by 
settling with the trust beneficiaries, has now become a conduit for the trust 
beneficiaries’ claim that Denney should have been more generous to the trust and 
less generous to himself. Under Barcelo, attorneys should not be forced 
to answer such claims. The privity rule should preempt lawsuits where the 
executor effectively serves as a pass-through for the beneficiaries’ claims.
III. A Bypass Suit for Every Bypass 
Trust?
            
Because of the conflicts of interest inherent in expecting an attorney to 
safeguard the interests of clients and beneficiaries alike, claims by 
disappointed beneficiaries would discourage attorneys from focusing solely on 
the client’s best interests, the essential teaching of Barcelo. I see no 
special significance to the fact that the beneficiaries here were beneficiaries 
to a trust that was not created by Denney’s will. Barcelo also concerned 
a separate trust that allegedly was not properly funded.[11] Regardless, the critical similarity with 
Barcelo is that the interests of the beneficiaries whose claims led to 
the malpractice suit were not necessarily aligned with the interests of the 
deceased client, and the mere risk of divided loyalties compelled us to maintain 
a bright-line privity barrier that precluded legal malpractice suits filed by 
third parties.
            
I would not read Belt to apply whenever third parties manage to 
bring suit against the estate instead of the attorneys or the client directly. 
Again, the trust beneficiaries here could have brought suit against Denney or 
his attorneys but declined to do so. In Barcelo, the disappointed trust 
beneficiaries apparently could have pursued litigation against the executor of 
the client’s estate, but instead settled with the estate “for what they 
contend[ed] was a substantially smaller share of the 
estate than what they would have received pursuant to a valid trust.”[12] Bypass trusts and other trusts are 
extremely common estate planning devices for couples wishing to minimize taxes 
or serve other estate planning goals.[13] As happened here, the beneficiaries to 
the trust created by the will of the first spouse to die may have to wait until 
the surviving spouse dies, since the surviving spouse typically receives income 
from the trust until death, and the corpus of the trust then goes to the 
beneficiaries. If Barcelo can be circumvented in three simple steps—(1) 
beneficiaries sue the estate to resolve an objection to how the trust was funded 
or created; (2) executor settles with the beneficiaries; (3) executor then 
recoups the settlement by suing the attorneys who long-ago advised one or both 
spouses—Barcelo’s privity bar will prove porous indeed. I would limit 
Belt to cases where the court can safely assume that the interests of the 
client, the executor, and the disappointed heir or trust beneficiary are plainly 
and truly aligned, a situation we manifestly do not see here.
            
Further, if the only prerequisite to suit against a deceased client’s 
attorney is that it must be brought by the executor, an endless variety of 
claims could be brought on the theory that the attorney’s advice resulted in a 
smaller estate or trust. Every lawyer who advised a client to 
plead guilty or not, file for bankruptcy or not, settle a dispute or not, 
incorporate a business or not, and so on, would be fair game. I suspect 
that many experienced estate-planning attorneys have encountered a client who 
plans to “breathe his last breath and spend his last dollar,” and who wishes not 
to be bothered with the paperwork, expense, meetings, or loss of control over 
assets involved in maximizing his estate. Today’s decision arguably places a 
duty on attorneys to dissuade such a client from his carefree inclinations, and 
to steer him instead to altruism, a task, in my view, better left to those with 
divinity degrees instead of law degrees.
            
The distinction between this case and Belt is best captured with 
this question: would the client be rooting for the executor and the 
beneficiaries? In Belt we assumed the answer was “yes” so long as the 
client wanted his estate-tax liability minimized, thus leaving more to the 
chosen heirs. As the interests of the client-testator, estate, executor, and 
heirs were perfectly aligned, extending privity from the client to the executor 
made perfect sense.
            
In today’s case, a “yes” answer is less clear. To put it mildly, the 
record does not suggest that Denney would be rooting for the trust 
beneficiaries, his six children, whom he wanted to inherit only nominal sums 
from himself and Des Cygne, with the bulk of his 
estate going to charity.[14] The California suit by the children 
directly precipitated the Texas legal malpractice suit. Barcelo 
endeavored to bar legal-malpractice suits by beneficiaries with a bright-line 
rule because conflicts might arise due to “concomitant questions as to the true 
intentions of the testator.”[15] Belt distinguished cases “when 
disappointed heirs seek to dispute the size of their bequest,”[16] and where the attorneys are being 
“second-guessed by the client’s disappointed heirs,”[17] the situation here.
            
Cox & Smith advised Denney regarding Des Cygne’s trust and her estate-tax filing. In the course of 
this advice the Cox & Smith attorneys advised Denney that the Automation 
Industries stock might, depending on choice-of-law questions, be deemed 
community property despite Denney’s written representation to the attorneys that 
“DesCygne and I had a firm understanding that she had 
no interest in my stock in [Automation Industries].” Cox & Smith recommended 
that Denney seek a declaratory judgment regarding the proper characterization of 
the stock, but he refused, and instead “made a decision that it . . . was his 
separate property,” according to the testimony of Cox & Smith attorney Jack 
Guenther. Denney always believed that the Automation Industries stock was his 
separate property, as he started the company in the 1940s, long before he 
married Des Cygne. Throughout his lifetime—through Des 
Cygne’s death, three divorces, and a stock sale while 
married to his fifth wife—Denney insisted the stock was his alone. O’Donnell’s 
testimony confirms Denney’s consistent position for thirty years was “that he, 
not any of his wives, owned all the Automation Industries stock.”
            
At bottom, the legal-malpractice claim is that Cox & Smith should 
have persuaded Denney to do something he believed was wrong and did not want to 
do. Denney’s lawyers should not be subject to suit, decades after their 
representation, for implementing their client’s express wishes to live out his 
life as a wealthier man, based on a then-defensible position that the stock was 
indeed his separate property and did not belong in Des Cygne’s trust. The privity rule serves to tell lawyers in 
this situation to fight for Denney, not against him, and try to assure that he 
gets to keep his stock.
            
This case presents a conflict between client and trust beneficiary 
(Denney and his children) and also requires a presumption, against all record 
evidence, that Denney would cheer his estate’s decision to settle with the 
children (who wanted the millions that Denney instead gave to charity) and then 
sue Cox & Smith for having carried out his wishes. Unlike the facts in 
Belt, what most benefits the living client who received the legal advice 
(treating the stock as separate property) and what the executor thought was in 
the estate’s best interest (paying millions to settle claims that the stock was 
community property) are contradictory. These conflicting, misaligned interests 
were not present in Belt.
IV. Conclusion
            
On these facts, we cannot indulge Belt-like presumptions that 
Denney’s interests while living “mirror those of his estate,”[18] that the estate’s interests “are 
compatible with the client’s interests,”[19] or that Denney would want to see his 
executor “standing in his shoes”[20] by suing the attorneys whose work Denney 
praised. O’Donnell is trying to squeeze into Denney’s shoes, but the fit is 
quite uncomfortable, and the Court should not allow it.
 
___________________________________
Don R. 
Willett
Justice
 
 
OPINION DELIVERED: June 
26, 2009









[1] Belt v. 
Oppenheimer, Blend, Harrison & Tate, Inc., 192 S.W.3d 780 (Tex. 
2006).

[2] Barcelo v. 
Elliott, 923 S.W.2d 575 (Tex. 1996).

[3] Belt, 
192 S.W.3d at 788.

[4] 
Barcelo, 923 S.W.2d at 578-79.

[5] Id. at 
577.

[6] Id. at 
578-79.

[7] Belt, 
192 S.W.3d at 782.

[8] 
Id.

[9] Id. at 
787 (footnote and citations omitted).

[10] Affidavits 
submitted by the executor’s experts assert that Denney failed to fund Des Cygne’s trust with Automation Industries stock worth 
approximately $1.8 million at the time of her death, resulting in claims by the 
trust beneficiaries that O’Donnell settled years later for over $12.86 million. 
O’Donnell also paid the estate counsel who advised him $2.3 million for eight 
months of work that included one deposition.

[11] 
Barcelo, 923 S.W.2d at 576.

[12] 
Id.

[13] See, 
e.g., Stoll v. Henderson, No. 01-07-00733-CV, 2009 WL 468872, at *1 
(Tex. App.—Houston [1st Dist.] Feb. 26, 2009, no pet. 
h.); In re Townley Bypass Unified Credit Trust, 
252 S.W.3d 715, 718–19 (Tex. App.—Texarkana 2008, no pet.); Baker Botts, L.L.P. v. Cailloux, 224 
S.W.3d 723, 733 (Tex. App.—San Antonio 2007, pet. denied); Rosen v. Wells 
Fargo Bank Texas, N.A., 114 S.W.3d 145, 148 (Tex App.—Austin 2003, no pet.); 
id. at 155–56 (Kidd, J., dissenting) (describing 
bypass trust); Guest v. Cochran, 993 S.W.2d 397, 399–400 (Tex. 
App.—Houston [14th Dist.] 1999, no pet).

[14] The flavor of 
the relationship between Denney and his children is provided in a letter Denney 
wrote to daughter Carolyn in 1979, a copy of which was sent to all his children, 
in which he made clear that he wanted his children only to inherit modest 
amounts:
 
As I look 
back over my life, I feel extremely fortunate to have been able to have started 
with absolutely nothing and end up with the potential, in some small way, to 
contribute to the world . . . .
                        

Now, I 
would like to discuss with you, each of my children, with your having the 
knowledge that each will receive a copy of this letter.
 
. . . 
DesCygne and I made the trip to pay a visit on more 
than one occasion with your extending less than a warm welcome to DesCygne. . . . As I recall, not too many months later, you 
insisted that you be given a wedding almost immediately. Your mother was very 
much opposed to the wedding, but I sanctioned same, only because of my suspicion 
of the nature of the urgency, which later became substantiated.
 
As you 
know, I soon became suspicious that [son in law] Gerry would never amount to 
anything. . . . The culmination of these episodes was the asking by you and 
Gerry that I loan to you $10,000.00 for the purchase of a gasoline filling 
station. The result, of which, was a complete squandering of the money.
 
            
. . . .
            

. . . 
DesCygne was very aware of the hatred you, [daughter] 
Mary, and [daughter] Anne felt for her . . . . DesCygne’s estate was only nominal, and resulted exclusively 
from what I had given to her . . . . In my will, there is an equally nominal 
amount to be divided equally between the six children. . . .
 
            
. . . I know you abhor the thought of getting a job . . . .
 
I was 
violently opposed to Mary marrying Gary; however, I gave them the best of 
weddings in Tulsa. Mary, was no better than you, in her hatred of DesCygne. . . 
.
 
            
. . . .
 
. . . Anne 
is the only one of my children who has ever visited me . . . .
 
With 
regard to [sons] Tommy and Pete, both of them were terrible problems for the 
several years following DesCygne’s death. These 
problems involved rebellion against all moral standards, consumption of drugs, 
inabilities to hold a job, scrapes with the law, and squandering of money. . . 
.
 
            
. . . .
 
With 
regard to [daughter] Deci, as you know, she has 
achieved an extremely poor academic record every school year. We still do not 
believe that this record is caused by anything other than a complete lack of 
application and a selfish desire to do ever what she wants. . . . Her use of 
drugs and alcohol has contributed to her downfall. . . .
 
            
. . . .
 
At the 
time Deci made her decision, I explained to her that 
she was not going to inherit, except in a very nominal way, from her mother or 
me . . . .
 
            
. . . .
 
Finally, I 
would like for you and the others to know, that upon my death the vast majority 
of my assets will go to the Denney Foundation.
 
            
Denney’s last wife Nanci, in a deposition, summarized the suit that 
Denney’s “horrible, odious, unattractive, disagreeable” children brought against 
the estate as follows: “They called him a liar and a fraud and a cheat. And I 
never understood why they really did it. I think they just wanted to get more 
money than he had left them.”

[15] 
Barcelo, 923 S.W.2d at 578.

[16] Belt v. 
Oppenheimer, Blend, Harrison & Tate, Inc., 192 S.W.3d 780, 787 (Tex. 
2006).

[17] 
Id.

[18] 
Id.

[19] Id. at 
789.

[20] See 
id. at 787 (“the estate ‘stands in the shoes’ of a 
decedent”); id. at 788–89 (noting that estate 
“merely ‘stands in the shoes’ of the client after 
death”).