# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-24-00693-CV

---

**Patrick Amy and Ruth Amy, Appellants**

**v.**

**Phyllis West-Cobb through her Next Friend Tammy Lewis, Appellee**

---

### FROM THE 423RD DISTRICT COURT OF BASTROP COUNTY
### NO. 423-6587, THE HONORABLE CHRISTOPHER DARROW DUGGAN, JUDGE PRESIDING

---

### M E M O R A N D U M   O P I N I O N

In this appeal following a jury trial, Patrick Amy and Ruth Amy challenge:  (i) the trial court's final judgment in favor of Phyllis West-Cobb, whose suit was brought through her daughter Tammy Lewis,[1] and (ii) the trial court's order imposing a constructive trust, appointing a receiver, and ordering the "sale of real property."  In three issues, the Amys contend that the trial court erred when it denied their no-evidence motion for summary judgment and their motion for judgment notwithstanding the verdict and that it "erred in imposing a constructive trust and appointing a receiver to sell [their] homestead property."  For the following reasons, we affirm the trial court's final judgment and order.

---

[1]  Because they have the same last name, we refer to the Amys by their first names when referring to them individually.  The record and parties state appellee's name inconsistently as either "Phyllis West-Cobb" or "Phyllis West Cobb."  In this opinion, we refer to her as Cobb.

# BACKGROUND[2]

## The Parties' Relationship

In 2008, Cobb, who was in her late 60s at the time,[3] reported memory issues to a doctor and, as she aged, her cognitive abilities further declined, and her symptoms of dementia worsened. At the time of her husband's death in January 2015, she and her husband lived in an approximately 2,000 square foot, fully-paid-for house on Spring Meadow (the Spring Meadow house) in Bastrop, Texas. After her husband died, Cobb continued to live in the house and, pursuant to her husband's will, possessed a life estate on the property. Her husband's children from a previous relationship were the remaindermen of the property when her life estate terminated.

In March 2015, the Bastrop Police Department hired Patrick as a police officer, and around July 2015, Cobb met him and began routinely riding along with him during his night shifts through the department's "Citizens on Patrol" (COP) program. Cobb also began spending time with Patrick and Ruth when Patrick was not on duty.

In February 2016, Cobb paid off the Amys' mortgage, which was in the amount of $125,647.32, on their house at 109 Bonham Lane. Cobb's attorney at the time prepared a promissory note in that amount and a deed of trust on the property securing the loan. The Amys made payments on the amount that they owed to Cobb under the note but stopped making payments in around January 2017 at Cobb's purported direction.

---

[2] Because the parties are familiar with the facts of the case, we do not recite them in this opinion except as necessary to advise the parties of the Court's decision and the basic reasons for it. *See* Tex. R. App. P. 47.1. The facts are taken from the evidence admitted at trial.

[3] According to nursing home records that were admitted at trial, Cobb was born in April 1939.

In November 2016, Cobb purchased an approximately 1,000 square foot house at 172 Jim Bowie Drive (the Jim Bowie house), which was very close to the Amys' house and, some months later, she moved her possessions from the Spring Meadow house and began living in the Jim Bowie house. Prior to her move, Cobb wrote checks to Patrick purportedly to pay for construction work that he had done on the Jim Bowie house.

After she had moved to the Jim Bowie house, Cobb listed the Spring Meadow house for sale with Carol Pease acting as her real estate agent. In November 2017, the remaindermen of the property filed a notice of termination of Cobb's life estate in the official public records of Bastrop County. They declared that Cobb had elected to no longer reside at the Spring Meadow house. In March 2018, the remaindermen also sued Cobb to clear title on the property, and in April 2018, they obtained a default judgment against her. The judgment terminated her life estate and awarded $3,000 in attorney's fees against her.

By the time that the suit by the remaindermen against Cobb had been filed, Patrick had been handling Cobb's financial affairs for months. On December 12, 2017, Cobb had signed a durable power of attorney (POA), which Patrick had drafted. The POA appointed Patrick as Cobb's agent to have "full power and authority to act on [her] behalf," including authorizing him to "manage and conduct all of [her] affairs and to exercise all of [her] legal rights and powers," "[c]onduct any business with any banking or financial institute [sic] with respect to any of [her] accounts," and "[s]ell, convey, lease, mortgage, manage, insure, improve, repair or perform any other act with respect to any of [her] property." The POA also stated that "[Patrick] shall be liable for willful misconduct or the failure to act in good faith while acting under the authority of this Power of Attorney."

On April 23, 2018, Patrick signed as Cobb's agent under the POA a release of the $125,647.32 lien on the Amys' property that secured the loan that the Amys owed to Cobb. A few days later, as Cobb's agent under the POA, Patick executed a quitclaim deed that transferred the Jim Bowie house from Cobb to himself, "an unmarried individual." Patrick did not contact Cobb's attorney but drafted the release of lien and quitclaim deed by himself, and after signing the documents as Cobb's agent, recorded them in the official public records of Bastrop County. Around this time, Cobb had gotten lost and confused and had driven by herself to Houston. After a person assisted Cobb by calling Patrick and Lewis, Patrick and his mother-in-law drove to Houston, picked up Cobb, and drove her home. Lewis spoke with Cobb after she returned home, but within weeks, Cobb's phone was turned off, and Lewis and others were unable to find or contact her.

On May 31, 2018, Ruth called EMS because Cobb was "adamant" that she would not go to the doctor and was "bright red" and "very upset." Cobb was taken to the hospital and then involuntarily committed pursuant to an Emergency Detention Order signed by a Bastrop Police Department sergeant who was a friend of Patrick's. Patrick asked the sergeant to go to the hospital to evaluate Cobb because she purportedly had expressed to Patrick that she wanted to kill herself. Lewis was not notified of Cobb's involuntary commitment, her subsequent admission to a nursing home, or her subsequent admission in July 2018 to the memory-care unit of a different nursing home. Although he was aware that Lewis was Cobb's daughter, Patrick had represented to medical personnel that Cobb did not have family. As a police officer in uniform, Patrick also was allowed to visit Cobb at the nursing home in the evenings and after hours when most of the staff had gone home and other visitors were not allowed.

4

Around June 2018, Patrick filed an application to transfer the title to Cobb's vehicle into his name and contacted Pease to list the Jim Bowie house for sale. Cobb signed a listing agreement with Pease, and purportedly at Pease's direction, Patrick and Ruth emptied out the contents of the Jim Bowie house, selling or disposing of Cobb's possessions. Patrick also had Cobb's dog euthanized. The Amys did not have receipts or documents to show what happened to the proceeds from the sale of Cobb's personal property that was in the Jim Bowie house. Cobb also owed property taxes on the Jim Bowie house that remained unpaid.

In July 2018, Patrick prepared, executed as Cobb's agent under the POA, and recorded another release of the lien that Cobb had held on the Amys' house at 109 Bonham Lane; and in August 2018, he recorded a corrected release of lien that Cobb signed, which allowed the Amys to obtain a home-equity loan on their property. Around this time, the Amys also signed and recorded a designation of homestead affidavit on their house on Bonham Lane in the official public records in Bastrop County.

In November 2018, Patrick prepared, executed as Cobb's agent under the POA, and recorded a subsequent quitclaim deed transferring the Jim Bowie house from him back to Cobb. Around this time, Pease had secured a buyer for the Jim Bowie house, and she and Tara Knox, the title agent, became concerned that something about the situation was not right. Knox was aware that Cobb had a daughter, but Patrick told her that "there was no family," which was a "red flag" for Knox. Another "red flag" for her was the quitclaim deed transferring the Jim Bowie house to Patrick that was signed by Patrick as Cobb's agent under the POA. The closing on the Jim Bowie house was stopped, and the sale cancelled. Pease contacted attorneys about the situation, the attorneys contacted Adult Protective Services (APS), and APS began an investigation in January 2019.

5

As part of the investigation, the APS investigator contacted Lewis, and she was reunited with Cobb. On February 27, 2019, Cobb revoked Patrick's POA. She also executed a POA appointing Lewis as her agent. Around this time, the Amys' son and a roommate were living in the Jim Bowie house. Lewis and an attorney told them to move out, and they did so within a few hours. The Amys' son purportedly had paid one month of rent in the amount of $1,000 that was paid to reduce the delinquent property taxes owed on the house. The conclusion from the APS's investigation was that the complaint of exploitation of Cobb was valid. Around the same time, the Texas Rangers also investigated the situation as a criminal matter, but the grand jury chose not to indict.

**Underlying Suit**

After being reunited with Cobb and obtaining the POA, Lewis sued the Amys on behalf of Cobb, asserting claims against the Amys of breach of fiduciary duty, fraud, violation of the Texas Theft Liability Act, *see* Tex. Civ. Prac. & Rem. Code §§ 134.001–.005, conversion of property, and conspiracy.[4] In May 2024, the Amys moved for no-evidence summary judgment challenging all elements of Cobb's claims. Cobb filed a response supported by the affidavit of Pease. The trial court denied the Amys' no-evidence motion for summary judgment, and the case proceeded to trial.

The jury trial occurred in August 2024. Cobb had remained in the nursing home's memory-care unit and was not able to attend trial. The witnesses at trial were Patrick, Ruth, the Amys' son, Lewis, Ruth's mother, Knox (the title agent), Pease, a long-time friend of Cobb, the APS investigator, another investigator who interviewed Patrick as part of the APS investigation,

---

[4] Cobb also sued the Amys' son, but the jury found that he was not part of a conspiracy that damaged Cobb, and the final judgment does not include awards against him.

6

the Texas Ranger who investigated the situation as a criminal matter, a business-office manager at the nursing home, Patrick's supervisor at the Bastrop Police Department, and a close friend of the Amys.

The exhibits admitted at trial included nursing-home records, which reflect that Cobb was diagnosed to have "unspecified dementia with behavioral disturbance," "unspecified psychosis not due to substance or known physiological condition," "cognitive communication deficit," "other specified depressive episodes," "schizoaffective disorder, unspecified," and "impaired decision making." The nursing home's business office manager testified that in her experience a characteristic of people in the memory-care unit suffering from dementia is that they have good and bad days. She also testified that when completing the paperwork for the transfer between nursing homes, Patrick represented to her that Cobb did not have family. She further testified that the "quitclaim deed on the household that [Cobb] lived in" "disqualified [Cobb] for Medicaid," and that Cobb was on self-pay for about two years because of the quitclaim deed, explaining that a resident can have a homestead and a vehicle but if certain assets are transferred within five years to admission into the nursing home, it is "considered a penalty." When they found out that Cobb was not eligible for Medicaid, Cobb received a 30-day discharge notice from the nursing home, but Lewis was able to "step in and help [them] out tremendously" so that Cobb was allowed to remain in the nursing home.

Other exhibits admitted at trial were copies of the December 2017 POA and the February 2019 revocation of the POA; the motion for default judgment against Cobb and the default judgment in the suit brought by the remaindermen concerning the Spring Meadow house; the transcripts of the depositions of Patrick, Ruth, their son, and Lewis; documents executed by Patrick as Cobb's agent under the POA, including the releases of liens on the Amys' house and

7

the quitclaim deeds conveying the Jim Bowie house from Cobb to Patrick and then from Patrick back to Cobb; photographs of Cobb's possessions that were in the Jim Bowie house; statements and copies of checks on Cobb's checking account; the Texas Rangers' investigation report; and the APS investigation report.

The investigative reports reflect that the criminal investigation was closed after the grand jury did not indict but that the APS investigation concluded that the allegation of exploitation of Cobb was valid. The APS report found that Patrick influenced Cobb to move closer to the Amys and that he admitted to using funds belonging to Cobb for his own benefit but explained that he was offsetting the amounts that he had spent of his own money for her benefit. He was unable to provide an accounting or receipts to document how Cobb's money was spent. The Texas Rangers report reflects that Patrick represented that Cobb gave him permission to use the money in her accounts and that she paid him $13,000 for labor and expenses for his construction work on the Jim Bowie house. The report also states that Patrick and Cobb opened a joint senior checking account in February 2016 with deposits showing payments by the Amys on their note, but that sometime around September 2017, Patrick began using the account for personal purchases and that the account balance was $12 in February 2019.

The bank statements from Cobb's checking account that were admitted as exhibits reflect monthly social-security deposits of around $2,000 and that the balance on her account as of March 2016 was around $40,000 and, as of February 2018, around $450. Between these two dates, Cobb wrote multiple checks to the Amys, including a check to Patrick for $7,500 in December 2016, a check to him for $5,000 in April 2017, a check to him for $2,500 in October 2017, and a check to him for $1,000 in January 2018. The statements also reflect significant withdrawals of cash from the account.

8

The parties presented conflicting theories to the jury concerning the relationship between the Amys and Cobb. Lewis's theory was that the Amys were having money problems when Patrick met Cobb; that they conspired to exploit and take advantage of her when she was suffering from dementia and her cognitive abilities had declined; that they misled her into believing that they would take care of her, that Cobb and Patrick were in a romantic relationship, and that he loved her more than his wife and children; and that they isolated Cobb from her family and friends, including by influencing her to leave her rent-free, "spacious" house to move into the Jim Bowie house near them so that they could sell the Spring Meadow house and obtain cash for their own benefit. In contrast, the Amys' theory was that the relationship between the Amys and Cobb had been misunderstood, that it was Cobb's idea and decision to forgive her loan to them, that she knew what she was doing and authorized the disputed transactions, that Cobb treated Patrick as a son, that Patrick obtained the POA so that the Amys could assist Cobb, and that Cobb was estranged from Lewis and did not want anything to do with her.

Patrick testified that he met Cobb in July 2015 working as a police officer and that they "became very close friends." He denied that the Amys suggested to Cobb that she move closer to them or knowing that she planned to sell the Spring Meadow house until she already had moved to the Jim Bowie house. At the time, he did not know that she only had a life estate in the Spring Meadow house, did not know what that was, and thought that she was "okay," but he noticed some "red flags," such as her "sweating profusely," "[d]riving to places and not knowing where she was," and "stopping in the middle of the road, parked" when driving around. When Cobb signed the POA that he drafted, he did not think she was "totally incompetent at that point." He testified that he was unaware of Cobb's financial circumstances, that he was not involved in Cobb's attempt to sell the Spring Meadow house, that he was paying

9

her bills about one or two months before she was admitted to the hospital, and that she "depended on [him] for quite a lot of meals," but that he had not maintained records of transactions.[5]  He also changed her mail to come to his house.

As to Cobb's payment of the Amys' mortgage in February 2016, Patrick testified that she stated to him that she did not like his mortgage company and wanted him out of that loan.  After she had taken over the loan, they made some payments but stopped making payments in January 2017 at her direction.  Patrick testified that Cobb released the lien on their home because "she didn't want her daughter to have any reason to come back on her property" and "didn't want anybody in her business."  He also testified that Cobb told him she was estranged from Lewis, that she did not have a relationship with Lewis, and that "the only time [Lewis] ever called her was to ask for money."  Patrick's mother-in-law, who lived with the Amys, also testified that Cobb told them that "all [Lewis] wanted was money" and that Cobb "didn't want anything to do with [Lewis]."  His mother-in-law believed that Cobb was competent at the time when she gave the Amys $125,000, that Cobb was "good" until she was in the nursing home, and that she was "somewhat" competent in the nursing home,[6] but testified that it would be "crazy" to think that a man is in love with you when you are having dinner with his family.

As to their decision to seek medical care for Cobb, Patrick testified that Ruth called EMS because Cobb was "sweating, shaking, bright red, very upset" and that he asked a

---

[5]  For example, he admitted that Cobb's lawnmower was at his house, but he testified that he "paid her for it" in cash and did not have a receipt.  He also testified that he did not keep records because he did not think that he would need them.

[6]  Patrick's mother-in-law testified about her visits with Cobb at the nursing home, including that Cobb recognized her and told her "[she] could use [Cobb's] car."

10

sergeant to go to the hospital to evaluate Cobb because she had expressed suicidal ideations. Patrick confirmed that a few weeks before Ruth contacted EMS, he and his mother-in-law travelled to Houston to pick up Cobb, who had gotten lost when driving around. Patrick's mother-in-law described Cobb's drive to Houston as a "crazy jaunt" and testified that she and Patrick drove to get her in "the middle of the night."

Patrick admitted that the Amys emptied the contents of the Jim Bowie house, that he changed the title of Cobb's car to be in his name, that he drafted and signed documents as Cobb's agent without contacting Cobb's attorney,[7] and that he retained Pease to sell the Jim Bowie property, but he testified that they emptied the house at Pease's direction to prepare it for sale. His answer to many questions was that he did not recall, including why Cobb's phone was cut off. As to the changed title to the car, Patrick testified that he could not register it unless he was the owner and that his mother-in-law drove the car with Cobb's permission. There was evidence that the Amys had paid some of Cobb's bills during the period that Patrick had the POA, that Patrick set up a payment plan for her delinquent property taxes, and that he arranged for portions of her monthly social-security checks to be paid to the nursing home and toward property taxes.

Ruth testified that she and Patrick had been married thirty years and that she was on "Team Amy" and participated with Patrick in taking care of Cobb and emptying the Jim Bowie house. She admitted to having an informal caregiver relationship with Cobb and to sharing a bank account with her that they opened before Patrick had the POA. She did not bring records from that account. She testified that Cobb paid $4,000 of the purchase price of a car for

---

[7] When asked why he decided not to contact Cobb's attorney, he answered, "I can't recall, sir."

her and that she was to pay the amount back through the joint account.  She admitted that Cobb had "started to slip," was not remembering things, and was repeating herself, but she testified that "[i]t did not concern [her]" that it was not in Cobb's best interest to forgive their loan.  Ruth testified that Cobb told them that "she wanted [them] to quit making payments" against the debt that they owed her and that she "wanted to forgive the loan."  She also testified that she "didn't really have any knowledge of [Cobb's] finances," that the Amys paid for some of Cobb's expenses with their own money, that she did the best that she could to help Cobb, and that she called EMS after Cobb was "adamant" that she was not going to the doctor and "really red and very upset."

The Texas Ranger who handled the criminal investigation testified that he was investigating the matter under Section 32.45 of the Texas Penal Code, the misapplication of fiduciary property.  The facts that he gathered in the investigation did not result in an indictment. He testified that his investigation was limited to facts after Cobb signed the POA, which was in December 2017, because "there was no evidence that at that point that she was suffering any dementia" and no one with whom he had spoken had an issue with the POA being "valid."  As part of his investigation, he interviewed the Amys, but he did not speak to Cobb because she was reported to be "giving confusing information" and "forgetful," and he did not ask for a final copy of the APS report, explaining that it was not germane because of the difference in the burden of proof between a civil and criminal matter.  The Texas Ranger testified that Patrick stated that his "only" goal was to "make sure" that Cobb was "taken care of."  Patrick had denied using money out of Cobb's account for the Amys' personal use, but the Texas Ranger determined otherwise. Patrick told the Texas Ranger that he did construction work on the Jim Bowie house "since she had no family to help her," that they were "close friends," and that he considered her family.

12

The Texas Ranger did not doubt what Patrick told him and found him credible. After reviewing the POA and other forms, the investigator who assisted APS by interviewing the Amys also was not concerned that there was financial fraud or evidence of exploitation, although he testified that the Amys had suggested to Cobb that she move closer to them so that they could spend more time together.

Patrick's supervisor at the police department, the Amys' friend, and their son provided testimony in support of the Amys' theory to the jury. Patrick's supervisor had no concerns that Patrick was exerting influence over Cobb, but the supervisor was not involved in the investigation and confirmed that Patrick had resigned from his position at the police department. The Amys' friend testified that she had met Cobb and that Cobb told her that she "was estranged" from her daughter and had not had a relationship with her "in at least twenty years," that Cobb "did not appear cognitively impaired at all" when the friend spoke with her, that Cobb referred to Patrick as her son, that Cobb had a "dominant personality" and ran Patrick "ragged a little bit," and that Ruth was a "very kind" person who "was all about her family." The Amys' son testified that he did not see Patrick taking advantage of Cobb, that he had grown to love Cobb, and that Cobb had told him that Lewis's husband had "ill intent towards [Cobb]" and that "it was regarding money." As to living in the Jim Bowie house, their son testified that he paid Patrick $1,000, which his father used to pay taxes on the property. He also testified that Cobb had co-signed on a loan for a motorcycle for him.

Lewis testified that she and other family were in contact with Cobb until her phone was turned off. She testified that she saw Cobb once a week before Cobb's husband died and that after he died, Cobb's cognitive abilities declined and that was around the time that Cobb met Patrick. Lewis had a confrontation with Cobb about her moving out of the Spring Meadow

13

house. Cobb told her that she "wanted to be closer to the Amys," that "they were going to take care of her," and that Patrick "loved her more than he loved his own wife and children." Lewis also recounted being called by a man at a gas station in Houston about Cobb being lost and then preparing to go pick her up before learning that Patrick was already on his way. After she was unable to reach Cobb by phone in April 2018, Lewis testified that she was searching for her mother, including going by the Jim Bowie house, but that she did not locate her until she was contacted by the APS investigator and told that Cobb was in the nursing home. She also testified that Cobb had stopped sending money to one of her sisters who was in an institution.[8] At that point, Patrick had taken over Cobb's account. Lewis further testified that Patrick's actions had diminished Cobb's accounts. When Lewis obtained the POA, Cobb owed around $32,000 to the nursing home and then had to pay around $58,000 more in self-pay because of Patrick's infraction of the Medicaid rules.

After she reconnected with Cobb, Lewis testified that her mother had good and bad days, that she had the mental capacity to revoke Patrick's POA, and that Cobb had told her to keep an "eye on Patrick making sure he [was] putting his monthly money into the bank account." Lewis explained that it was "out of character" for her mother to forgive a loan. She further testified about Cobb's possessions that were in the Jim Bowie house before the Amys emptied it, and as to the period when Patrick had the POA, paperwork that was missing, insurance policies that had lapsed, a $5,000 loan on an insurance policy that was unaccounted for, and the lack of receipts to show that the Amys purchased things for Cobb.

---

[8] Lewis testified that Cobb "had been given a special amount of money to care for [her sister] when [Lewis's] grandmother passed away. And [Cobb] sent little stipends of money to [her sister] in there to make sure that [her sister] had some spending money. Because [her sister] had been crippled her entire life."

14

Cobb's friend for over twenty-years testified that Cobb had gotten mad at her and their other friends because they told her not to move to the Jim Bowie house, which the friend described as a "fishing cabin"; that after that, she could not find Cobb as Cobb was not answering her phone or at home; that she ultimately found Cobb at the nursing home; that previously, the friend had mentioned to Patrick that she was concerned about Cobb's memory and he said that he had noticed it; and that looking back, the friend believed that Cobb had diminished capacity. The friend testified that Cobb had been aware that she only had a life estate in the Spring Meadow house but appeared to have forgotten. When she was asked,

> Looking back and piecing everything together, don't you think that she was suffering, as you testified early, from a severe case of Alzheimer's when she purportedly made this gift to a guy that she'd only known for a short time?

The friend answered, "On the backside, yes. Frontside no." The friend also had not known Cobb to make a gift like that in all the years she had known her.

As to the initiation of the APS investigation, the title agent Knox testified that the sale of the Jim Bowie house was cancelled and that she sent the real-estate agent Pease to an attorney because of several "red flags" arising from the transaction. She testified that the quitclaim deed that Patrick signed transferring the Jim Bowie house from Cobb to Patrick and Patrick's statement to Knox that Cobb did not have family were "red flags." Knox was aware that Cobb had a daughter. Patrick also had told her in 2016 that Cobb "was not able to sign" and "incompetent."

Pease, who was retired and living in Florida, confirmed that she had reported the situation to APS and travelled from Florida for the trial "[t]o do the right thing." Pease testified that she met Patrick before meeting Cobb, that his testimony that she met Cobb first was not true,

15

that he introduced Pease to Cobb to seek Pease's assistance for Cobb to buy the Jim Bowie house, and that he told Pease that "there was no family," Cobb "had no relatives," "[h]e was as close to her as anybody," and Cobb "was like a mother to him." Patrick "brought [Cobb] to see the house, so he supposedly could better care for her," and Cobb told Pease that "they were in love and they were going to get married." Pease also testified that Patrick later asked her to list the Jim Bowie house for sale, but she denied directing him to empty Cobb's possessions to prepare it for sale. Pease also answered, "Yes, absolutely," when asked if she thought Patrick had "exploited [Cobb] by taking advantage of her diminished capacity and exerting undue influence over her for his own financial gain." She also testified that Knox expressed "alarm" to her and was "very disturbed by the relationship between them."

The APS investigator testified that there was evidence that Cobb was mentally declining, vulnerable, and easily influenced after her husband's death and that when he spoke with Cobb at the nursing home, she was suffering some level of diminished mental capacity. He found it "very suspicious" to use the POA to forgive the debt on the Amys' house "when [Cobb] really didn't know what kind of decisions she was making." He also explained how the quitclaim deeds transferring Cobb's property from Cobb to Patrick and then back to her resulted in the penalty and the delay in her ability to be approved for Medicaid. He believed that Patrick was not credible or forthcoming, that it was "plausible" that Patrick unduly influenced Cobb by visiting her in his uniform at the nursing home's "secure ward after hours," and that the Amys' influence was "driving [Cobb's] decisions." The investigator testified that the investigation's disposition of exploitation was valid, specifically referencing the forgiven loan of $125,647.32. The investigator's goal was to stop the exploitation and make sure Cobb was secure, and he believed the goal had been met. She was in the nursing home and reunited with Lewis. In his

16

view, Cobb suffered from dementia and "didn't understand what was happening but earlier on in the investigation it was found that she had expected to be paid back."

Lewis on behalf of Cobb sought damages in the amount of Cobb's loan to the Amys, the value of the personal property that the Amys sold or disposed of when emptying the home, and the cost of her care at the nursing home that she was required to pay out of pocket because of the quitclaim deeds that Patrick signed and recorded. Lewis testified that when she was appointed Cobb's agent under the POA, Cobb owed around $32,000 to the nursing home, and because of the quitclaim deeds, there was a two-year delay before Cobb could receive Medicaid benefits, resulting in her having to self-pay an additional amount of $58,000.

The parties did not object to the jury charge that was submitted to the jury, and the jury returned a verdict in favor of Cobb. Their findings included that there was a fiduciary relationship between Patrick and Cobb and between Ruth and Cobb, that the Amys did not fulfill their informal fiduciary duties to Cobb, that Patrick did not fulfill his formal fiduciary duties as Cobb's agent under the December 2017 POA, that the Amys committed fraud against Cobb, that the Amys committed theft of Cobb's property, that they converted her property, and that they were part of a conspiracy to damage Cobb.

In its final judgment, the trial court incorporated some of the jury's findings and awarded the following damages against the Amys, jointly and severally: $250,350 for actual damages incurred as a result of their breach of fiduciary duties, $250,000 for exemplary damages incurred as a result of their breach of fiduciary duties, $20,000 for exemplary damages incurred as a result of the fraud committed by the Amys, and $50,000 for exemplary damages incurred as

17

a result of their theft and conversion of her property.[9]  The trial court further ordered Cobb to recover $87,430.18 and $65,793.75 in reasonable attorney's fees.

The trial court also signed the separate order imposing a constructive trust, order appointing receiver, and "order of sale of real property."  The trial court created a constructive trust over $250,350 of the value of the Amys' house on 109 Bonham Lane and appointed a receiver to take charge and possession of the property.  The trial court authorized the receiver to market the property for sale and ordered the receiver, "should a buyer be found, [to] submit a report of sale to [the trial court] for further proceedings."  This appeal followed.

## ANALYSIS

**Denial of No-Evidence Motion for Summary Judgment**

In their first issue, the Amys contend that the trial court reversibly erred when it denied their no-evidence motion for summary judgment.  But "[w]here a motion for summary judgment is denied by the trial court and tried on its merits, the order denying the motion for summary judgment is not reviewable on appeal."  *Barnes v. University Fed. Credit Union*, No. 03-10-00147-CV, 2013 Tex. App. LEXIS 4871, at *11 n.3 (Tex. App.—Austin Apr. 18, 2013, no pet.) (mem. op.) (citing *Ackermann v. Vordenbaum*, 403 S.W.2d 362, 365 (Tex. 1966)); *see Ackermann*, 403 S.W.2d at 365 (limiting appellate review of denied motions for summary judgment "to cases in which motions for summary judgment have been filed by all

---

[9] The jury also awarded the following damages based on fraud:  $7,700 (loss of life estate including attorney's fees that were awarded in default judgment), $126,647.32 (value of release of lien), and $112,118.40 (nursing home self-pay cost during penalty period).  Based on their affirmative answers to the theft and conversion claims, the jury also awarded the following damages:  $28,000 (value of personal property at the Jim Bowie house), $200 (critical papers located at the Spring Meadow house), $100 (memorabilia), $100 (family bible), $4,000 (yard and garden implements), and $50 (family pet, Buster).

18

of the real parties at interest and the appeal is prosecuted from a judgment granting one or more of them"). Thus, in this appeal from the trial court's final judgment following a jury trial, the trial court's denial of the Amys' no-evidence motion for summary judgment is not reviewable. *See Barnes*, 2013 Tex. App. LEXIS 4871, at *11 n.3; *see also Dounson v. Bexar Appraisal Dist.*, No. 04-11-00010-CV, 2011 Tex. App. LEXIS 4721, at *3–4 (Tex. App.—San Antonio June 22, 2011, no pet.) (mem. op.) (explaining that reviewing denial of motion for summary judgment following trial on merits "could result in judgments which would be patently unjust" (quoting *Ackermann*, 403 S.W.2d at 365)). We overrule the Amys' first issue.

**Denial of Motion for Judgment Notwithstanding the Verdict**

In their second issue, the Amys argue that the trial court reversibly erred in denying their motion for JNOV because the jury's findings on liability, damages, and attorney's fees lacked legally sufficient evidence. In particular, the Amys argue that there was not legally sufficient evidence to support (i) an award of compensatory damages for fraud, breach of fiduciary duty, theft, or conversion; (ii) a finding of civil conspiracy; (iii) an award of exemplary damages against them; or (iv) an award of attorney's fees.

*Standard of Review*

"A JNOV is proper when the evidence is conclusive and one party is entitled to prevail as a matter of law, or when a legal principle precludes recovery." *Zarate v. Rodriguez*, 542 S.W.3d 26, 35 (Tex. App.—Houston [14th Dist.] 2017, pet. denied) (citing *Houston Med. Testing Servs., Inc. v. Mintzer*, 417 S.W.3d 691, 695 (Tex. App.—Houston [14th Dist.] 2013, no pet.)). Among the proper grounds for a trial court to grant a motion for JNOV is when there is no evidence to support the jury's finding. *Komet v. Graves*, 40 S.W.3d 596, 603 (Tex. App.—

19

San Antonio 2001, no pet.) (citing Tex. R. Civ. P. 301; *Brown v. Bank of Galveston*, 963 S.W.2d 511, 513 (Tex. 1998)); *see* Tex. R. Civ. P. 301 (addressing trial court's judgments and authorizing trial court upon motion and notice to "disregard any jury finding on a question that has no support in the evidence").

"We review a party's challenge to the trial court's grant or denial of a motion for judgment notwithstanding the verdict under the standard for legal sufficiency." *Hunter v. PriceKubecka, PLLC*, 339 S.W.3d 795, 806–07 (Tex. App.—Dallas 2011, no pet.) (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 823 (Tex. 2005)). "In determining whether there is no evidence to support a jury verdict, we consider the evidence favorable to the jury's verdict and reasonable inferences that tend to support it." *Komet*, 40 S.W.3d at 603 (citing *Brown*, 963 S.W.2d at 513). "No evidence exists when the record discloses a complete absence of evidence that supports a vital fact." *Id.* (citing *Juliette Fowler Homes, Inc. v. Welch Assocs. Inc.*, 793 S.W.2d 660, 666 n. 9 (Tex. 1990)).

*Compensatory Damages*

The Amys do not challenge the amount of compensatory damages that the jury awarded but that compensatory damages were recoverable at all under any of Cobb's theories of recovery. In the final judgment, the trial court awarded compensatory damages in the amount that the jury found would compensate Cobb for the Amys' breach of their fiduciary duties but did not award compensatory damages for the amounts that the jury found for her other claims. *See Crown Life Ins. v. Casteel*, 22 S.W.3d 378, 390 (Tex. 2000) ("Under the one satisfaction rule, a plaintiff is entitled to only one recovery for any damages suffered."); *see also Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 7 (Tex. 1991) ("The one satisfaction rule applies to

20

prevent a plaintiff from obtaining more than one recovery for the same injury."). In this context, we limit our discussion of the evidence to support an award of compensatory damages for the Amys' breach of their fiduciary duties.

"Generally, the elements of a claim for breach of fiduciary duty are (1) the existence of a fiduciary duty, (2) breach of the duty, (3) causation, and (4) damages." *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 220 (Tex. 2017). As to whether an informal fiduciary duty existed between Patrick and Cobb, the jury was instructed:

> A relationship of trust and confidence existed if Phyllis West Cobb justifiably placed trust and confidence in Patrick Amy to act in Phyllis West Cobb's best interest. Phyllis West Cobb's subjective trust and feelings alone do not justify transforming arm's length dealings into a relationship of trust and confidence.

*See Meyer v. Cathey*, 167 S.W.3d 327, 330 (Tex. 2005) (recognizing "an informal fiduciary duty that arises from 'a moral, social, domestic or purely personal relationship of trust and confidence'" (quoting *Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 287 (Tex. 1998))); *Gregan v. Kelly*, 355 S.W.3d 223, 227–28 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (explaining that courts review "variety of facts" to determine whether informal fiduciary duty exists but that "overarching consideration" is "nature of relationship between the parties" (citing *Thigpen v. Locke*, 363 S.W.2d 247, 253 (Tex. 1962))).

The jury also was instructed:

> *Informal* fiduciary relationships are distinguished from formal fiduciary relationships such as principal-agent under a Power of Attorney which as a matter of law are relationships of trust and confidence.
>
> * * *

21

Because a formal relationship of trust and confidence existed between them, as Phyllis West Cobb's agent, Patrick Amy owed Phyllis West Cobb a fiduciary duty. To prove he complied with his duty, Patrick must show—

1.      The transactions in question were fair and equitable to Phyllis West Cobb; and

2.      Patrick Amy made reasonable use of the confidences that Phyllis West Cobb placed in him; and

3.      Patrick Amy acted in the utmost good faith and exercised the most scrupulous honesty toward Phyllis West Cobb; and

4.      Patrick Amy placed the interests of Phyllis West Cobb before his own and did not use the advantage of his position to gain any benefit for himself at the expense of Phyllis West Cobb; and

5.      Patrick Amy fully and fairly disclosed all important information to Phyllis West Cobb concerning the transactions.

The jury received the same list of fiduciary duties when asked if Patrick had fulfilled his informal fiduciary duty to Cobb, and the jury found that Patrick did not fulfill his informal or formal fiduciary duties. The jury also received similar instructions as to Ruth when asked if she had an informal fiduciary relationship with Cobb and if she had fulfilled her informal fiduciary duties. The jury found that she had an informal fiduciary relationship and that she had not fulfilled her informal fiduciary duties.

As to the jury's findings that the Amys owed fiduciary duties to Cobb, the Amys do not dispute that Patrick, as Cobb's agent under the POA, had fiduciary duties to Cobb as a matter of law, but they argue that there was no evidence that Ruth "owed or breached any fiduciary duty" because Ruth testified that she was not involved in Cobb's financial affairs and Cobb presented no evidence to contest this testimony. Ruth, however, admitted in her testimony that she had an informal caregiver relationship with Cobb and testified that she was part of "Team Amy," participated with Patrick in caring for Cobb, shared a bank account with Cobb,

and participated in discussions with Cobb and Patrick about Cobb forgiving the loan that they owed to her. We conclude that the evidence was legally sufficient to support the jury's findings that Patrick and Ruth owed fiduciary duties to Cobb. *See Parker*, 514 S.W.3d at 220; *Cathey*, 167 S.W.3d at 330.

As to the elements of breach, causation, and damages, the Amys argue that the evidence did not support the jury's finding "that such a [fiduciary] duty has been breached, resulting in damages to [Cobb] for the contested transactions." They argue that the evidence was insufficient to support the jury's findings because "[t]he POA explicitly authorized Patrick Amy to manage [Cobb's] financial affairs and real property"; that he "acted consistently with this authority and [Cobb's] instructions, including releasing the lien on 109 Bonham Lane and executing the quitclaim deeds for 172 Jim Bowie"; and that Patrick was "adhering to [Cobb's] wishes." The Amys' argument depends on the jury believing and crediting their testimony that Cobb directed them to take the actions that they did—that they were following Cobb's wishes— and, if she did direct them to take the actions that they did, she was competent to do so. The jury, however, was free to disbelieve their testimony. *See City of Keller*, 168 S.W.3d at 819–20 (explaining that jurors are sole judges of credibility of witnesses and weight to give to testimony and that they "may choose to believe one witness and disbelieve another" (citing *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986))).

In finding that the Amys' breached their fiduciary duties to Cobb that resulted in compensatory damages, the jury could have credited the evidence that Cobb was vulnerable and suffering from dementia and that her cognitive abilities had significantly declined during the time that the Amys had assumed control of her care and finances and that during this period, Cobb's financial circumstances significantly worsened due to the Amys' action and to their

23

benefit. There was evidence that it was "out of character" for Cobb to forgive a loan and that the Amys had isolated her from family and friends. Cobb's phone was turned off, and Patrick was representing to others, including medical personnel, that she did not have family. In her testimony, Ruth acknowledged that Cobb had "started to slip," was not remembering things, and was repeating herself, but that "[i]t did not concern [Ruth]" that it was not in Cobb's best interest to forgive the loan of over $125,000 to them.

The evidence also showed that the Amys worked together to empty Cobb's house and dispose of her possessions after Cobb was placed in the nursing home, and there was evidence that the Amys were unable to show through receipts or other documents that the proceeds from Cobb's property that was sold was used for Cobb's benefit but that they had used Cobb's money for their own benefit. Further, the evidence showed that during the time that Patrick was Cobb's agent under the POA, the default judgment was obtained against her resulting in the loss of her life estate on the Spring Meadow house and a judgment against her for attorney's fees, and the quitclaim deeds that Patrick drafted, signed, and recorded transferring Cobb's house from him and then back to her caused Cobb to be penalized and have to self-pay for two years for her care at the nursing home.

Viewing the evidence in the light most favorable to the jury's findings, we conclude that there was legally sufficient evidence to support their findings that the Amys breached their fiduciary duties to Cobb and that their breaches resulted in compensatory damages to Cobb.[10] *See Cathey*, 167 S.W.3d at 330. Thus, we conclude that the evidence was legally

---

[10] Based on the court's instructions in the jury charge, the jury could have found that emptying the Jim Bowie house and signing and recording the release of the lien and quitclaim deeds were not "fair and equitable" to Cobb, the Amys did not place the interests of Cobb before their own and used the advantage of their positions to gain benefits for themselves at the expense

24

sufficient to support an award of compensatory damages to Cobb based on the Amys' breach of their fiduciary duties to Cobb and do not reach the Amys' arguments concerning the evidence to support compensatory damages under Cobb's other theories of recovery. *See* Tex. R. App. P. 47.1.

*Conspiracy Between the Amys*

As part of their second issue, the Amys argue that there was not legally sufficient evidence to support the jury's finding of civil conspiracy between Patrick and Ruth.

"'Civil conspiracy is a derivative action premised on an underlying tort.'" *Gary E. Patterson & Assocs. v. Holub*, 264 S.W.3d 180, 204 (Tex. App.—Houston [1st Dist.] 2008, pet. denied) (quoting *Gonzales v. American Title Co. of Hous.*, 104 S.W.3d 588, 594 (Tex. App.—Houston [1st Dist.] 2003, pet. denied)). The elements of civil conspiracy are:

> (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as a proximate result.

*Tri v. J.T.T.*, 162 S.W.3d 552, 556 (Tex. 2005). As to the element of an unlawful, overt act, a cause of action for conspiracy may be based on a breach of fiduciary duty. *See Lesikar v. Rappeport*, 33 S.W.3d 282, 302 (Tex. App.—Texarkana 2000, pet. denied) ("Types of torts or unlawful acts on which a cause of action for conspiracy may be based include breach of a fiduciary duty.").

of Cobb, and they did not disclose all important information to her concerning the transactions. *See Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000) ("[I]t is the court's charge, not some other unidentified law, that measures the sufficiency of the evidence when the opposing party fails to object to the charge." (citing Tex. R. Civ. P. 272, 274, 278, 279)).

"[P]roof of a conspiracy must usually be made by circumstantial evidence." *Paschal v. Great W. Drilling, Ltd.*, 215 S.W.3d 437, 453 (Tex. App.—Eastland 2006, pet. denied) (citing *Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp.*, 435 S.W.2d 854, 858 (Tex. 1968)). "Inferences of concerted action may be drawn from joint participation in the transactions and from enjoyment of the fruits of the transactions." *Id.* (citing *International Bankers Life Ins. v. Holloway*, 368 S.W.2d 567, 582 (Tex. 1963)); *see also Lesikar*, 33 S.W.3d at 302. And once "[a] conspiracy is proven, each conspirator is responsible for all acts done by any of the conspirators in furtherance of the conspiracy." *Paschal*, 215 S.W.3d at 451 (citing *Carroll v. Timmers Chevrolet, Inc.*, 592 S.W.2d 922, 926 (Tex. 1979)).

Based on our review of the evidence, we have concluded that it was legally sufficient to support an award of compensatory damages based on Cobb's breach-of-fiduciary-duty claims, and the evidence detailed above supports findings that the Amys were acting in concert in their fiduciary relationships with Cobb and that they enjoyed "the fruits of the transactions." *See id.* at 453. Although the Amys presented evidence to support their position that they did not conspire to take advantage of Cobb and that they were acting at her direction, it was within the province of the jury to resolve conflicts in the evidence and to find otherwise. *See City of Keller*, 168 S.W.3d at 819–20; *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003) (stating "familiar principle" that fact finder remains sole judge of witnesses' credibility and weight to be given their testimony).

Viewing the evidence in the light most favorable to the jury's finding, we conclude that there was legally sufficient evidence of a conspiracy between Patrick and Ruth, making them each responsible for the other's acts in furtherance of their conspiracy. *Chu v. Hong*, 249 S.W.3d 441, 445 (Tex. 2008) ("[C]o-conspirators are each responsible for the

26

damage the conspiracy caused." (citing *State v. Standard Oil Co.*, 107 S.W.2d 550, 559 (Tex. 1937))).

*Exemplary Damages*

As part of their second issue, the Amys argue that there was not legally sufficient evidence to support an award of exemplary damages against them because the jury's award was not supported by clear and convincing evidence of fraud, malice, or gross negligence. *See* Tex. Civ. Prac. & Rem. Code § 41.003(a) (generally requiring proof by clear and convincing evidence that harm with respect to which claimant seeks recovery of exemplary damages results from fraud, malice, or gross negligence). "'Clear and convincing' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 41.001(2).

The Amys do not challenge the amounts of exemplary damages that the jury found against them or the trial court's awards of exemplary damages on multiple claims but argue that exemplary damages were not recoverable at all because there was legally insufficient evidence to show that they acted with fraud, malice, or gross negligence. They argue that the evidence established that they acted within the authority of the POA and at Cobb's direction. The jury, however, could have disbelieved their testimony and awarded exemplary damages based on their finding that the Amys acted with fraud. *See id.* § 41.001(6) (defining "fraud" to mean "fraud other than constructive fraud"); *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 47 (Tex. 1998) (defining fraud as "'a material misrepresentation, which was false, and which was either known to be false when made or was asserted without knowledge of its truth, which was intended to be acted upon, which was relied

27

upon, and which caused injury'" (quoting *Sears, Roebuck & Co. v. Meadows*, 877 S.W.2d 281, 282 (Tex. 1994))).

As to their affirmative findings that Patrick and Ruth committed fraud against Cobb, the jury could have credited the evidence that when she met the Amys, Cobb's cognitive abilities were declining; that they were aware that Cobb was vulnerable—having just lost her husband and suffering from dementia and cognitive mental decline—and that she had financial resources; that they made false representations to Cobb that they would take care of her with the intent that she rely on their misrepresentations; that she relied on their misrepresentations to her detriment; and that she suffered damages as a result. *See Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d at 47.[11]

After the Amys became involved with Cobb, her checking account was depleted with significant amounts of cash withdrawals and checks to Patrick and Ruth, and after moving out of the Spring Meadow house, Cobb forfeited her life estate and rent-free place to live and became isolated from her family and friends. There was evidence that the Amys influenced her to move to the Jim Bowie house and to trust them with her financial affairs by representing to her that they would take care of her and that Patrick loved her more than his wife and children. Patrick also represented to others that Cobb did not have family when he knew that she did and testified that he could not recall why Cobb's phone was turned off. Patrick did not contact Cobb's attorney to prepare the POA but prepared it himself, and after Cobb signed the POA, he prepared and signed the release of lien that forgave the debt of over $125,000 that the Amys owed Cobb, depleting Cobb's financial resources, and there was evidence that when she was in the nursing home, Cobb intended for them to pay the loan back to her. The evidence also

---

[11] The jury's instruction tracks the elements of fraud.

28

showed that Cobb was penalized and her qualification for Medicaid delayed, resulting in her having to pay out of pocket for her nursing home care, because as Cobb's agent, Patick signed the quitclaim deeds transferring the Jim Bowie house to himself and then back to her. The jury could have credited this evidence to form a firm belief or conviction that the Amys acted with fraud when taking actions concerning Cobb. *See* Tex. Civ. Prac. & Rem. Code § 41.001(6); *Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d at 47. Thus, we conclude that there was clear and convincing evidence to support an award of exemplary damages.

*Attorney's Fees*

As part of their second issue, the Amys also challenge the jury's award of attorney's fees. The jury found that the reasonable fees for the legal services of Cobb's attorneys were $87,430.18 and $65,793.75, and the trial court's final judgment awarded these amounts to Cobb.

In their issue on appeal, the Amys do not challenge the reasonableness of the attorney's fees that Cobb incurred or that attorney's fees were recoverable based on her theft claim. *See* Tex. Civ. Prac. & Rem. Code § 134.005(b) (authorizing person who has prevailed under chapter to recover court costs and reasonable and necessary attorney's fees). They argue that the evidence was legally insufficient to support an award of attorney's fees because Cobb "failed to segregate recoverable fees from non-recoverable fees." The Amys, however, did not object when the attorneys testified in support of their fees or when their time entries were admitted as exhibits, and they did not object to the jury charge. Thus, they have not preserved this issue for our review. *See In re A.M.W.*, 313 S.W.3d 887, 893 (Tex. App.—Dallas 2010, no pet) (observing that party waives complaint regarding failure to segregate fees if complaining

29

party fails to object during testimony in support of attorney's fees or to jury question on attorney's fees (citing *Green Int'l, Inc. v. Solis*, 951 S.W.2d 384, 389 (Tex. 1997))); *Cullins v. Foster*, 171 S.W.3d 521, 535–36 (Tex. App.—Houston [14th Dist.] 2005, pet denied) (concluding that complaint about failure to segregate recoverable from non-recoverable attorney's fees was waived because party "did not object at trial to the expert's testimony or to the jury instruction on the grounds of failure to segregate").

### *Conclusion as to Challenge to Trial Court's Denial of Motion for JNOV*

For these reasons, we conclude that the Amys have not shown that the trial court reversibly erred in denying their motion for JNOV and, therefore, overrule their second issue.

## Order Imposing Constructive Trust, Appointing Receiver, and Ordering Sale of Property

In their third issue, the Amys argue that the trial court reversibly erred in imposing a constructive trust and appointing a receiver to sell their homestead property.

### *Standard of Review and Applicable Law*

We review the trial court's imposition of a constructive trust and appointment of a receiver for abuse of discretion. *Pettit v. Tabor*, No. 06-19-0002-CV, 2020 Tex, App. LEXIS 325, at *15 (Tex. App.—Texarkana Jan. 15, 2020, pet. denied) (mem. op.) (reviewing trial court's imposition of constructive trust, as equitable remedy, for abuse of discretion (citing *Baker Botts, L.L.P. v. Cailloux*, 224 S.W.3d 723, 736 (Tex. App.—San Antonio 2007, pet. denied)); *Spiritas v. Davidoff*, 459 S.W.3d 224, 231 (Tex. App.—Dallas 2015, no pet.) (reviewing trial court's appointment of receiver for abuse of discretion). "A trial court abuses its discretion when its 'ruling is arbitrary and unreasonable, made without regard for guiding legal principles or supporting evidence,' or 'when it fails to analyze or apply the law correctly.'" *Tabor*, 2020 Tex,

App. LEXIS 325, at \*15 (quoting *In re Nationwide Ins. Co. of N. Am.*, 494 S.W.3d 708, 712 (Tex. 2016) (orig. proceeding)).

A trial court may appoint a receiver "under the rules of equity." Tex. Civ. Prac. & Rem. Code § 64.001(a)(7). A trial court also may impose a constructive trust as "an equitable, court-created remedy designed to prevent unjust enrichment." *KCM Fin. LLC v. Bradshaw*, 457 S.W.3d 70, 87 (Tex. 2015) (citing *Meadows v. Bierschwale*, 516 S.W.2d 125, 131 (Tex. 1974) ("Constructive trusts, being remedial in character, have the very broad function of redressing wrong or unjust enrichment in keeping with basic principles of equity and justice.")). A constructive trust's creation "prevent[s] a wrongdoer from profiting from her wrongful acts." *Tabor*, 2020 Tex, App. LEXIS 325, at \*15–16 (quoting *Gray v. Sangrey*, 428 S.W.3d 311, 315 (Tex. App.—Texarkana 2014, pet. denied)).

Generally, the elements that a party requesting a constructive trust must establish are: "(1) breach of a special trust or fiduciary relationship or actual or constructive fraud; (2) unjust enrichment of the wrongdoer; and (3) an identifiable res that can be traced back to the original property." *Bradshaw*, 457 S.W.3d at 87 (citing *Matter of Haber Oil Co.*, 12 F.3d 426, 437 (5th Cir. 1994) (applying Texas law)).

*Did the trial court abuse its discretion in imposing the constructive trust and appointing the receiver?*

As an initial matter, we observe that, in its order, the trial court did not authorize the receiver to sell the Amys' property. The trial court authorized the receiver to take charge and possession of the Amys' property and to market it for sale but to "submit a report of sale to this court for further proceedings" if a buyer for the property was found. The Amys also do not challenge the value of the constructive trust placed on their property.

31

Further, we have concluded that there was evidence that the Amys committed fraud and breached their fiduciary duties to Cobb by their actions that resulted in the release of Cobb's lien of over $125,000 on their property, and the record reflects that they did not record their voluntary designation of their house as their homestead until after Patrick had filed the releases of Cobb's lien on their property.[12] Crediting this evidence, the trial court reasonably could have concluded that the Amys were unjustly enriched by their actions and that the fraudulent and improper use of Cobb's money was traceable to their claimed homestead interest in their property. *See id.*; *see also Brooks v. Wycough*, No. 12-24-00186-CV, 2025 Tex. App. LEXIS 61, *25 (Tex. App.—Tyler Jan. 8, 2025, pet. denied) (mem. op.) (stating that "unjust enrichment may be found under circumstances in which one person obtained a benefit from another by fraud, duress, or the taking of an undue advantage" (citing *Heldenfels Bros. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992)); *Pace v. McEwen*, 617 S.W.2d 816, 818 (Tex. App.—Houston [14th Dist.] 1981, no writ) (detailing evidence that supported finding that "property in question had been acquired by Pace with funds fraudulently obtained by him from Mrs. Spence and the conclusion that the property was not Pace's homestead"); *Baucum v. Texam Oil Corp.*, 423 S.W.2d 434, 442 (Tex. App.—El Paso 1967, writ ref'd n.r.e.) ("It has long been decided that homestead and exemption laws of this State were never intended to be, and cannot be, the haven of wrongfully obtained money or properties.").

On this record, we cannot conclude that the trial court abused its discretion by imposing a constructive trust and appointing a receiver to possess and market the Amys'

---

[12] The exhibits at trial included a copy of a designation of a homestead affidavit signed by Ruth and Patrick that was recorded in the official public records of Bastrop County in August 2018 and a voluntary designation of homestead that was signed by Patrick and recorded in the official public records of Bastrop County in June 2019.

property for sale.  *See Tabor*, 2020 Tex, App. LEXIS 325, at *15 (describing when trial court abuses its discretion).  We overrule the Amys' third issue.

## CONCLUSION

Having overruled the Amys' issues, we affirm the trial court's final judgment and its order imposing a constructive trust, appointing a receiver, and ordering the "sale of real property."

_____

Rosa Lopez Theofanis, Justice

Before Justices Triana, Theofanis, and Crump

Affirmed

Filed:   July 3, 2025

33